

**NUMBER 13-06-626-CR**

**COURT OF APPEALS**

**THIRTEENTH DISTRICT OF TEXAS**

**CORPUS CHRISTI - EDINBURG**

---

**JUAN CARLOS LOPEZ,** **Appellant,**

**v.**

**THE STATE OF TEXAS,** **Appellee.**

---

**On appeal from the 105th District Court of Nueces County, Texas.**

---

**O P I N I O N**

**Before Chief Justice Valdez and Justices Yañez and Benavides**
**Opinion by Justice Yañez**

Appellant, Juan Carlos Lopez, was indicted on two counts of aggravated sexual assault of a child.[1]  The jury found Lopez guilty on both counts, and imposed a punishment of life imprisonment and a $10,000 fine for each count.  Lopez now appeals his judgment of conviction, arguing through five issues that reversible error occurred at trial.  Because

---

[1] TEX. PENAL CODE ANN. § 22.021 (Vernon Supp. 2008).

we find that trial court error affected Lopez's substantial rights, we reverse and remand for a new trial.

## I. BACKGROUND

The State's factual theory of this case at trial was as follows. In the afternoon of June 21, 2004, Lopez was driving in Corpus Christi when he came across the complainant in this case (hereinafter fictitiously referred to as "John"). John, a sixteen-year-old boy, was sitting at a bus stop by himself when Lopez approached in his vehicle. Despite not knowing Lopez, John entered Lopez's vehicle. Lopez gave John a ride to a residence belonging to one of John's friends. He also gave John his cell phone number and invited John to "party" with him that night.

Later that day, John called Lopez to discuss hanging out. Lopez then met John outside the friend's residence, and the two drove to Lopez's apartment. While at the apartment, Lopez and John drank liquor, smoked marihuana, talked, and watched television. At some point, John's eyes began burning and he fell asleep. He briefly awoke to see Lopez "sucking [his] penis." John fell asleep and then briefly awoke again, at which point he found himself being sodomized by Lopez. John did not have the strength to move during this time. When John fully awoke in the morning, he observed that (1) he was only wearing his boxers and shirt, but not his pants; (2) there appeared to be fecal stains on his shirt and the inside of his boxers; (3) his anus was sore; and (4) he felt "sperm" around his anus. John asked Lopez what happened, and Lopez only responded that John had gotten "fucked up." On September 1, 2004, John made an outcry regarding the June 21 incident. The outcry led to an investigation that resulted in Lopez's indictment and trial.

Lopez's theory of the case was as follows. Lopez stopped near John at the bus stop

2

because he mistook John for someone he knew. Lopez quickly realized his mistake, but he and John nevertheless began conversing. John asked Lopez for a ride, and Lopez obliged. Prior to exiting Lopez's vehicle, John asked for and received Lopez's phone number. John wanted the number because he wanted to hang out with Lopez later that day. John later called Lopez about hanging out. Lopez then picked John up and took him to his apartment, where they talked and watched television. At John's urging, the two also drank alcohol and smoked marihuana provided by Lopez, who was not aware of John's age. At some point, Lopez went to his bedroom to go to sleep, leaving John in the living room to sleep on a couch. No sexual contact occurred between them. When Lopez awoke in the morning, he saw John sitting on the couch, waiting for Lopez to awake so he could be driven to his sister's residence. Lopez did not see any stains on John's clothing. He drove John to his sister's residence, and the two did not speak to each other again.

At trial, the State sought to convict Lopez on two counts of aggravated sexual assault. According to the State, the two sexual assaults occurred when Lopez caused John's sexual organ to contact or penetrate Lopez's mouth,[2] and when Lopez caused the penetration of John's anus.[3] At the time of the assaults, Lopez had the human immunodeficiency virus (HIV), the virus which causes acquired immune deficiency syndrome (AIDS). Furthermore, the State's theory of the case was that both sexual assaults occurred without the use of a condom, which allowed John to come into contact with Lopez's bodily fluid. The State thus alleged the aggravating element of the assaults

---

[2] *Id.* at § 22.021(a)(1)(B)(iii).

[3] *Id.* at § 22.021(a)(1)(B)(i).

to be the intentional and knowing use or exhibition of a deadly weapon in the course of the assaults[4]—namely, Lopez's bodily fluids, which in the manner of their use were capable of causing death and serious bodily injury.[5] Lopez was ultimately convicted on both counts of aggravated sexual assault.

## II. EXPERT TESTIMONY ON JOHN'S TRUTHFULNESS & CREDIBILITY

In his first issue, Lopez argues that the trial court erred (1) when it permitted Texas Ranger Roberto Garza, an investigator, to express his opinion on John's truthfulness, and (2) when it permitted Dr. Sam Hill III, a clinical psychologist, to express an opinion as to the truthfulness of the class of persons to which John belonged.

### A. Garza's Testimony

Garza led the investigation into John's allegations against Lopez. On direct examination, the State asked Garza: "From your experience investigating these types of cases involving teenage boys, do teenage boys want to talk about being anally raped?" Lopez's counsel objected to the question, arguing that Garza was not qualified to answer. The trial court sustained the objection and directed the State to "create a predicate." The State then asked Garza a number of questions relating to his experience in investigating child sexual assaults, which ultimately led to the following verbal exchange:

---

[4] *Id.* at § 22.021(a)(2)(A)(iv).

[5] *See generally Mathonican v. State*, 194 S.W.3d 59, 69-71 (Tex. App.–Texarkana 2006, no pet.) (finding defendant's HIV-positive seminal fluid was capable of causing death or serious bodily injury); *Degrate v. State*, No. 05-04-00218-CR, 2005 Tex. App. LEXIS 547, at *4-8 (Tex. App.–Dallas Jan. 26, 2005, no pet.) (mem. op., not designated for publication) (finding legally and factually sufficient evidence that the mouth of an HIV-positive defendant was a deadly weapon when defendant bit the complainant); *Najera v. State*, 955 S.W.2d 698, 700-01 (Tex. App.–Austin 1997, no pet.) (finding legally and factually sufficient evidence that defendant's penis and seminal fluids were capable of causing death); *Weeks v. State*, 834 S.W.2d 559, 561-65 (Tex. App.–Eastland 1992, pet. ref'd) (finding evidence was sufficient to sustain HIV-positive defendant's attempted murder conviction for spitting at complainant).

Q [THE STATE]. In this particular case, did you believe that an anal rape had occurred?

[LOPEZ'S COUNSEL]: Objection, Your Honor. That's completely outside the province—that is outside the realm of his expertise. It invades the province of the jury. It's irrelevant. It's prejudicial and under the Ducket (sp.ph.) Case, we object, Judge.

THE COURT: It's as a result of his investigation. Overruled.

[GARZA]: Based on the information that we received, yes, I believed that there had been an anal sex or an anal penetration that had been [sic] or anal assault on this victim because of how he described that he felt pain or soreness in his butt, like he first said it.

Lopez argues that the trial court, in permitting Garza to give his opinion because it was the "result of his investigation," inferred that Garza was "capable of rendering an opinion on the complainant's truthfulness based on his expertise in investigating sexual assault cases." The State argues that, if viewed in the context of his earlier testimony, it is clear that Garza's complained-of testimony is not an opinion on John's truthfulness, explaining:

> The State's question to Ranger Garza as to whether he believed that an anal rape occurred . . . did not directly question the truthfulness of the victim, but only asked for Ranger Garza's deduction from the context of what was alleged and the physical evidence he had at the time of his investigation. In fact, only later did the victim reveal to Ranger Garza that he was anally raped, such that Ranger Garza could not have formed an opinion about his truthfulness at the time of his initial investigation. Accordingly, in context, it is clear that the prosecutor was merely asking whether the circumstances of the assault . . . suggested an anal rape.

We reject the State's explanation. We conclude the State asked a question that was intended to illicit an inadmissible opinion on John's truthfulness, and the question accomplished this objective.

There was no physical evidence in this case; there was only an allegation from John

that physical evidence existed before he disposed of it. The only basis for Garza's belief that an anal rape occurred was John's outcries. Moreover, contrary to the State's contention, Garza did not base his belief on evidence provided to him before he met John. Garza testified that he believed John was sexually assaulted "because of how he described that he felt pain or soreness in his butt." The only time John offered such a description was during an interview at the Children's Advocacy Center,[6] which Garza observed first-hand. Accordingly, Garza's complained-of testimony expressed an opinion on John's truthfulness, and the trial court erred in allowing this opinion to be presented to the jury.[7]

At a later point in his direct examination, however, Garza proffered an additional opinion on John's truthfulness:

> Q [THE STATE]. Okay. Did [John] come out and say the defendant put his anus—I mean, put his penis in the victim's anus?
>
> A [GARZA]. No, he did not.
>
> Q. Does that mean, then, that it just didn't happen, in your opinion?
>
> A. No, *it just means* that he was too embarrassed to talk about it.[8]

By affirmatively rejecting the possibility that the sexual assault did not occur, Garza expressed an opinion, without objection, on John's truthfulness. Accordingly, any error

---

[6] John outcried about being anally raped before meeting with Garza, but the outcry did not entail any comment relating to the pain he felt.

[7] *See Yount v. State*, 872 S.W.2d 706, 712 (Tex. Crim. App. 1993) (holding that Texas Rule of Evidence 702 "does not permit an expert to give an opinion that the complainant or class of persons to which the complainant belongs is truthful").

[8] Emphasis added.

arising from Garza's complained-of testimony was rendered harmless.[9]

## B. Dr. Hill's Testimony

Dr. Hill, a clinical psychologist, was an expert witness for the State. During direct examination, Dr. Hill testified as follows:

Q [THE STATE]. Have you evaluated the truthfulness of teenage boy victims when they outcry about sexual assault?

[LOPEZ'S COUNSEL]: Judge, object. This is—

[THE COURT]: Overruled. You can answer that one.

A [DR. HILL]. Yes, ma'am.

Q. And what is—what has your evaluation found?

[LOPEZ'S COUNSEL]: Judge, I'd like to make an objection. Judge, I object. This is invading the province of the jury. I'd object that it is not relevant, and it's relevant—the prejudice outweighs the probative value. There is no showing that this witness is competent to say when someone is telling the truth to something that he himself has not observed.

[THE COURT]: That wasn't the question. You're overruled.

[DR. HILL]: What was the question?

Q. What is your impression when you have evaluated whether teenage boys, that their truthfulness about things like this?

A. *Generally, they tell the truth*.

[LOPEZ'S COUNSEL]. Judge, I'm renewing my objection. This witness can't possibly know.

THE COURT: This is based upon his study. It's his evaluation. That's all it is. Based upon his experience as a psychiatrist, psychologist.

---

[9] *See Leday v. State*, 983 S.W.2d 713, 717-18 (Tex. Crim. App. 1998) (explaining that "when a court has overruled an objection to evidence, the ruling usually will not be reversible error when the same evidence is subsequently admitted without objection").

[THE STATE]: Pass the witness.[10]

Dr. Hill's aforementioned testimony (hereinafter referred to as "truth testimony") proffered an opinion regarding the truthfulness of the class of persons to which John belonged, which crossed the line between assisting the jury and attempting to replace the jury as trier of fact with respect to John's credibility.[11] Because "[a]n expert who testifies that a class of persons to which the victim belongs is truthful is essentially telling the jury that they can believe the victim in the instant case as well,"[12] we find that the trial court abused its discretion when it allowed Dr. Hill's truth testimony to go before the jury.[13]

Though we find that Lopez preserved this error for review, we must still determine whether the error was rendered harmless by Garza's unobjected-to testimony on John's truthfulness.[14] We have reviewed what other appellate courts have done in this situation and have found mixed results. The Twelfth Court of Appeals, for instance, recently issued an opinion reversing a conviction for the sexual assault of a child because a clinical psychologist indirectly expressed her belief that the complainant's assault claim was truthful.[15] The court's harm analysis ignored whether the psychologist's testimony was rendered harmless because of the testimony of an investigator, who was permitted to

---

[10] Emphasis added.

[11] *See Duckett v. State*, 797 S.W.2d 906, 920 (Tex. Crim. App. 1990).

[12] *Yount*, 872 S.W.2d at 711.

[13] *Id.* at 712. We note that the State makes no attempt to contest this finding.

[14] *See generally Crocker v. State*, 573 S.W.2d 190, 201 (Tex. Crim. App. 1978) (noting that "[i]t is well established that the improper admission of evidence does not constitute reversible error if the same facts are shown by other evidence which is not challenged").

[15] *Long v. State*, No. 12-07-00256-CR, 2008 Tex. App. LEXIS 8885, at *12-31 (Tex. App.–Tyler Nov. 26, 2008, no pet.) (mem. op., not designated for publication).

8

testify that he believed the complainant.[16]  The Fifth Court of Appeals, on the other hand, recently issued an opinion finding an investigator's opinion on a child-complainant's truthfulness to be harmless due to a detective and the complainant's grandmother expressing similar opinions without objection.[17]  Lastly, the Fourteenth Court of Appeals, in *In re G.M.P.*, determined that a police officer's opinion on the child-complainant's truthfulness was not rendered harmless by the complainant's mother, who proffered a similar opinion without objection.[18]  The court based its decision on the belief that the "mother's opinion of her son's truthfulness was not the same caliber of evidence as the officer's expert testimony," which was "*likely to carry exceptional weight and an aura of reliability.*"[19]

We agree with the nature of *In re G.M.P.*'s reasoning, which was similarly employed by the court of criminal appeals in *Armstrong v. State*.[20]  The defendant in *Armstrong* was found guilty of capital murder.[21]  During the punishment phase, the deceased's wife testified for the State about the deceased's good character.[22]  The defendant claimed the

---

[16] *Id.* at *26-31.

[17] *Carter v. State*, No. 05-06-01209-CR, 2008 Tex. App. LEXIS 74, at *2-5 (Tex. App.–Dallas Jan. 8, 2008, pet. ref'd) (mem. op., not designated for publication) (citing *Briones v. State*, 12 S.W.3d 126, 130 (Tex. App.–Fort Worth 1999, no pet.); *Marles v. State*, 919 S.W.2d 669, 672 (Tex. App.–San Antonio 1996, pet. ref'd)).  We note that we have reviewed *Briones* and *Marles*, and have found that they are not directly on point to the matter at hand.

[18] 909 S.W.2d 198, 204-06 (Tex. App.–Houston [14th Dist.] 1995, no pet.).

[19] *Id.* at 206 (emphasis added).

[20] *Armstrong v. State*, 718 S.W.2d 686, 702 (Tex. Crim. App. 1986).

[21] *Id.* at 696.

[22] *Id.* at 696-97.

wife's testimony was admitted in error, and the court of criminal appeals agreed.[23]  The

State argued that the wife's testimony was rendered harmless because the same evidence

was admitted elsewhere through multiple witnesses without the defendant's objection.[24]

The court rejected this argument, explaining:  "The glancing testimony of the other witness

to deceased's niceness cannot be considered 'the same facts'; nor was it of remotely the

same emotional caliber as [the wife's] testimony, *in terms of likelihood of inflaming the*

*jury's emotions.*"[25]  Employing the reasoning used in *Armstrong* and *In re G.M.P.*, we find

that Dr. Hill's truth testimony was not rendered harmless by Garza's testimony, for Dr. Hill's

truth testimony was likely to carry greater weight with the jury, despite the fact that both

witnesses testified as experts.  The reasons for this stem from (1) Lopez having rebutted

the import of Garza's testimony during cross-examination, but not Dr. Hill's, and (2) the

State having emphasized Dr. Hill's truth testimony to the jury during closing argument, but

not Garza's.

The admission of Dr. Hill's truth testimony is non-constitutional error,[26] and a non-

constitutional error "that does not affect substantial rights must be disregarded."[27]

Substantial rights are not affected by the erroneous admission of evidence if the appellate

court, after examining the record as a whole, has fair assurance that the error did not

---

[23] *Id.* at 702.

[24] *Id.* at 701.

[25] *Id.* at 702 (emphasis added).

[26] *See Schutz v. State*, 63 S.W.3d 442, 444-46 (Tex. Crim. App. 2001) (discussing the application of non-constitutional error harm analysis to trial error involving expert witness who commented on the truthfulness of complainant's allegations).

[27] T EX. R. APP. P. 44.2(b).

10

influence the jury, or had but a slight effect.[28]   When a trial court errs by improperly admitting evidence, an appellate court determines the likelihood that the error adversely affected the jury's decision by considering everything in the record, including: (1) testimony or physical evidence admitted for the jury's consideration; (2) the nature of the evidence supporting the verdict; (3) the character of the alleged error and how it might be considered in connection with other evidence in the case; (4) the jury instructions; (5) the State's theory and any defensive theories; (6) closing arguments; (7) voir dire; and (8) whether the State emphasized the error.[29]

As previously stated, the State asked Dr. Hill whether teenage boys are truthful when they make a sexual abuse outcry, to which he responded:  "Generally, they tell the truth."   Though this testimony is not an incredibly impactful endorsement of John's truthfulness, the State exacerbated its impact when it overstated the testimony during closing argument, stating: "Dr. Sam Hill told you that teenage boys are very embarrassed about [being sexually assaulted].  And most importantly, Dr. Sam Hill told you that teenage boys do not lie about these kinds of things."  Lopez promptly objected to this statement and requested an instruction to disregard.  The trial court sustained the objection, but declined to instruct the jury to disregard, thus nullifying any practical benefit of having sustained the objection.

Dr. Hill's truth testimony was further bolstered by the trial court, which allowed Dr. Hill to testify as to the truthfulness of teenage boys because—as the court explained in

---

[28] *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002).

[29] *Haley v. State*, 173 S.W.3d 510, 518-19 (Tex. Crim. App. 2005).

front of the jury—his testimony was "based upon his study," "[b]ased upon his experience as a . . . psychologist." Case law clearly reveals that the trial court's rationale for admitting Dr. Hill's testimony is plainly wrong, and contrary to controlling law. As explained by the court of criminal appeals in *Yount v. State*:

> While a witness may possess "scientific, technical, or other specialized knowledge" concerning sexually abused children, we seriously question whether any such person also possesses "scientific, technical or other specialized knowledge," beyond the realm of the jury, regarding the truthfulness of those children. As stated by one court, "Psychologists and psychiatrists are not, and do not claim to be, experts at discerning truth. Psychiatrists are trained to accept facts provided by their patients, not to act as judges of patients' credibility."[30]

Lopez's defense at trial was that John had fabricated the sexual abuse allegations to avoid being schooled in a discipline program called the Alternative Education Program, which John began re-attending the day before he made his initial outcry. The outcome of the case thus depended on whether the jury believed John to be credible, or believed that he had fabricated the charges for the reason proffered by Lopez. Accordingly, any harm attributable to Dr. Hill's truth testimony stems from its potential to unduly tilt the jury towards believing John's testimony.

Considering the record as a whole, we are left with a fair assurance that the trial court's error influenced the jury only slightly. Though the State emphasized Dr. Hill's truth testimony during closing argument, the trial court subsequently instructed the jury that it was "the exclusive judge of the facts proved, of the credibility of the witnesses, and of the weight to be given their testimony." The jurors had ample evidence before them through which they could form their own opinions of John's truthfulness. The jury saw and heard

---

[30] 872 S.W.2d at 710 (quoting *State v. Moran*, 728 P.2d 248, 255 (Ariz. 1986)).

12

John testify about the sexual assault with specific detail, giving them an opportunity to evaluate his maturity and credibility. The jury also heard John's sister testify about his behavior after Lopez left him at her home. The sister testified that John appeared "dazed," "confused," and "just looked kind of thrown off." She testified that she saw a large stain on John's shirt, which coincided with John's own testimony. She also testified that John informed her of his belief that Lopez had placed something in his drink, which caused his eyes to start burning. Lastly, the jury heard from witnesses that received John's outcries. The individual who heard John's initial outcry testified that John was crying uncontrollably before and during the outcry. Witnesses who heard subsequent outcries testified that John expressed a great deal of emotion in discussing what occurred between him and Lopez.

Judging the nature of the evidence supporting the verdict and the character of the error and its relationship with other evidence, we conclude the trial court's error did not have a substantial and injurious effect or influence in determining the jury's verdict and did not affect Lopez's substantial rights. Therefore, we disregard the trial court's non-constitutional error as harmless. We resolve Lopez's first issue against him.

### III. IMPROPER JURY ARGUMENT

In his fifth issue, Lopez argues that the trial court erred when it overruled his objection concerning jury argument the State made during its rebuttal closing argument at the guilt phase of the trial. The court of criminal appeals recently set out the law applicable to this issue in *Brown v. State*, wherein the court stated:

> It is the duty of trial counsel to confine their arguments to the record; reference to facts that are neither in evidence nor inferable from the evidence is therefore improper. Thus, proper jury argument generally falls within one of four general areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing

13

counsel; and (4) plea for law enforcement. The arguments that go beyond these areas too often place before the jury unsworn, and most times believable, testimony of the attorney. Consequently, error exists when facts not supported by the record are interjected in the argument, but such error is not reversible unless, in light of the record, the argument is extreme or manifestly improper.[31]

In order to preserve the error for appellate review, however, there must be a proper objection.[32] The objection must state a specific ground to be sufficient,[33] and the ground of error asserted at trial is the only ground that may be asserted on appeal.[34]

Lopez argues that the State "engaged in improper jury argument by inserting new and harmful facts into the trial." The pertinent portion of the prosecutor's argument is as follows:

> [THE STATE]: Look at the records of the defendant's phone calls. Notice how many times he was calling different numbers during the day, the same number. It almost looked like he was angry at someone or he'd just broken up with someone. Something was going on that day and something didn't go right for the defendant, so he turned to [John], we think, in order to—
>
> [LOPEZ'S COUNSEL]: Judge, I'll object. She's arguing outside the record. There's no evidence.
>
> [THE STATE]: Excuse me. I'm talking about the cell phone records.
>
> THE COURT: It's argument. Overruled.
>
> [THE STATE]: Okay. Look at that. Something was going on. He was upset. He couldn't get one lover, so he decided to pick on this child.

Lopez asserts "[t]he State engaged in complete speculation when it concocted a story

[31] No. AP-75,294, 2008 Tex. Crim. App. LEXIS 852, at *13-14 (Tex. Crim. App. Sept. 24, 2008) (citations and internal quotations omitted).

[32] Nichols v. State, 754 S.W.2d 185, 199 (Tex. Crim. App. 1988).

[33] See Hougham v. State, 659 S.W.2d 410, 414 (Tex. Crim. App. 1983).

[34] Miller v. State, 566 S.W.2d 614, 619, 621 (Tex. Crim. App. 1978).

about Lopez being unable to get over one lover and therefore, prey[ed] on the complainant."

In response, the State first argues that any error stemming from the complained-of jury argument was not preserved for review. The State contends that Lopez's objection was not timely because it was able to state all of the following before an objection was made: "It almost looked like he was angry at someone or he'd just broken up with someone. Something was going on that day and something didn't go right for the defendant, so he turned to [John], we think, in order to—[.]"[35] Paradoxically, the State also contends that Lopez waived error by objecting *too early*, explaining: "Defendant fails to show or preserve error where he makes a premature objection by cutting off the prosecutor's argument in mid-sentence, when, although that argument may appear to be headed in an improper direction, the sentence might nevertheless have been completed in a permissible manner."

We find that Lopez's objection was neither too early, nor too late. Lopez's objection was sufficiently prompt to preserve the claimed error for appellate review. The objection was not too early because the nature of the State's argument was readily perceptible at the point Lopez interjected,[36] and Lopez's perception of where the argument was heading was proven correct when the State later completed the argument. We further reject the State's

---

[35] *See generally Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991) (discussing rules governing the preservation of error relating to the admission of evidence in criminal cases).

[36] The direction of the jury argument in this case is clearer than that discussed in other cases, wherein the appellate court determined that defense counsel's objection was premature. *See, e.g., Felder v. State*, 848 S.W.2d 85, 95-96 (Tex. Crim. App. 1992); *Denning v. State*, No. 05-96-00935-CR, 1998 Tex. App. LEXIS 684, at *8-11 (Tex. App.–Dallas Feb. 4, 1998, no pet.) (not designated for publication); *Thomas v. State*, 750 S.W.2d 234, 234-35 (Tex. App.–Dallas 1986, no pet.).

15

contention that Lopez waived error by not objecting again after the State completed the argument. Because we find no basis for waiver, we find the claimed error was preserved for our review.

The State next argues that the jury argument was proper. The jury argument was based, in part, on Lopez's cell phone records. The records, admitted at trial, revealed outgoing and incoming calls from Lopez's cell phone on June 21, 2004—the day Lopez and John met. More specifically, the records revealed the following: (1) from 7:36 p.m. to 8:34 p.m. on the night in question, eight outgoing phone calls were made to a number we shall hereinafter fictitiously refer to as "777-7777"; all calls lasted less than a minute; (2) at 8:34 p.m., John called Lopez's cell phone; the call lasted less than a minute; (3) from 8:37 p.m. to 9:27 p.m., fifteen outgoing phone calls were made to 777-7777; all calls lasted less than a minute; (4) at 9:43 p.m., John again called Lopez's cell phone; the call lasted less than a minute; and (5) after John's second call was received, no additional calls were made to 777-7777 for the remainder of the night or the following day.

The possessor of the 777-7777 number was never identified at trial. The State questioned Lopez about the number, but he testified that he did not recognize the number and did not recall calling it on the night in question. In addition to Lopez's phone records, the jury argument was also based on the testimony of Jeremiah Avalos, Lopez's former lover, and Karen Garcia, Lopez's friend. Avalos testified that he and Lopez had ended their relationship on less-than-amicable terms shortly before June 2004, and Garcia testified that Lopez and Avalos's relationship was "off-and-on" in June 2004. Relying on all this evidence, the State defends the jury argument, explaining:

[E]vidence at trial suggested that Lopez was in the process of breaking up

16

with Avalos at the time, and that his phone records reflected numerous unexplained calls, many to the same telephone number, just before Lopez picked up and assaulted [John]. Numerous calls to the same number within a short span of time do reasonably suggest some sort of tension between the people involved. It is further reasonable to infer the possibility, or even the probability, considering the context of Lopez breaking off his homosexual relationship with Avalos and his later homosexual assault that night on [John], that this tension likewise involved a homosexual encounter of some sort. Completing this picture, it is finally also reasonable to infer that the frustration and disappointment of a failed homosexual encounter caused Lopez to then center his attention on [John] as a substitute partner.[37]

"It is . . . well established that counsel may in argument draw from the facts in evidence *all inferences* that are reasonable, fair, and legitimate and he will be afforded latitude without limitation in this respect so long as his argument is supported by the evidence and offered in good faith."[38] "[A]n *inference* is a conclusion reached by considering other facts and deducing a *logical consequence* from them."[39] In the instant case, the State's suggestion that Lopez was experiencing frustration and disappointment from "a failed homosexual encounter" prior to meeting with John—thus prompting him to sexually assault John—is not a "logical consequence" that can be deduced from Lopez's recent termination of a long-term relationship and the numerous and unexplained 777-7777 calls.

We find that the jury argument was premised on *speculation*—"mere theorizing or guessing about the possible meaning of facts and evidence presented."[40] The evidence at trial revealed that Lopez and Avalos had broken-up numerous times, and that it was

---

[37] STATE'S BRIEF at 37.

[38] *Griffin v. State*, 554 S.W.2d 688, 690 (Tex. Crim. App. 1977) (emphasis added).

[39] *See Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007) (emphasis added).

[40] *Id.*

Lopez who had recently elected to end the relationship. There was no evidence showing that Lopez had a history of violent behavior upon breaking-up with Avalos, or that Lopez's recent break-up had left him in a mentally or emotionally unstable state. There was no evidence relating to Lopez's dating habits or his sexual encounters once his relationship with Avalos ended. There was no evidence that the 777-7777 number belonged to a male homosexual that knew Lopez. There was no evidence that the 777-7777 number even belonged to an individual, as opposed to a place of business.

Moreover, the fact that there are a limited number of explanations for the numerous 777-7777 calls does not change the speculative nature of the State's jury argument. In *Felder v. State*, for example, the defendant was accused of capital murder.[41] The evidence showed that the victim "was stabbed repeatedly 'back and forth' in the head and neck."[42] During closing argument, the prosecutor suggested to the jury that the defendant's motive for puncturing the victim's neck eight times—punctures that were medically proven to have not caused the victim's death—was to torture the victim or assess whether the victim was still breathing.[43] In assessing the propriety of the jury argument, the court of criminal appeals stated: "It seems clear to us that, taken as a whole, this argument invites the jury to speculate as to appellant's motive in inflicting the neck wounds."[44]

For all these reasons, we find that the State's jury argument invited the jury to speculate as to Lopez's motive for sexually assaulting John, and that the trial court thus

[41] 848 S.W.2d at 87.

[42] *Id*. at 95.

[43] *Id.*

[44] *Id*. at 96.

18

erred in admitting the argument over Lopez's objection. Because the trial court's error was non-constitutional in nature,[45] we must disregard it if it did not affect Lopez's substantial rights.[46] We make this determination by balancing the severity of the misconduct (i.e., the prejudicial effect), any curative measures, and the certainty of conviction absent the misconduct.[47] In evaluating the severity of the misconduct, we must assess whether the jury argument is extreme or manifestly improper by looking at the entire record of final arguments to determine if there was a willful and calculated effort on the part of the State to deprive Lopez of a fair and impartial trial.[48]

We do not believe the jury argument was a willful and calculated effort on the part of the State to deprive Lopez of a fair and impartial trial. Though no curative measure was taken in response to the State's jury argument, the adverse effect of the error was mitigated by the fact that the State did not need to prove Lopez's motive to secure a conviction. Therefore, the certainty of conviction remains largely the same absent the misconduct. For these reasons, we find that the State's jury argument did not have a substantial and injurious effect or influence in determining the jury's verdict on guilt. We also find, though with greater difficulty, that the jury argument did not have a substantial and injurious effect or influence in determining the jury's verdict on *punishment*. Though in some cases, the prejudice from improper jury argument is apparent from the jury's

---

[45] *See Brown*, 270 S.W.3d at 19.

[46] T EX. R. APP. P. 44.2(b).

[47] *Brown*, 270 S.W.3d at 19-20.

[48] *Id.* at 20.

imposition of the maximum sentence,[49] this is not one of those cases. Lopez's fifth issue is therefore overruled.

## IV. Extraneous Acts

### A. Introduction

In his third issue, Lopez asserts the trial court erred in allowing the State to present extraneous misconduct through the testimony of Avalos, Lopez's ex-boyfriend. Without objection from Lopez's counsel, Avalos provided the following testimony: (1) he was sixteen-years-old when he met Lopez; (2) he is ten years younger than Lopez; (3) he was seventeen-years-old when he became sexually involved with Lopez; and (4) the sexual relationship involved Lopez performing oral and anal sex on him. The State attempted to question Avalos about having unprotected sex with Lopez, which prompted Lopez's counsel to object and request a hearing outside the jury's presence. After the jury was excused, the following discussion took place:

> THE COURT: All right. The jury is outside the courtroom. What is your objection?
>
> [LOPEZ'S COUNSEL]: Judge, I would object because I believe that she's going to inquire of this witness, whether my client had unprotected anal and oral sex with him without telling him that he had HIV. That, Your Honor, would be an offense. It's certainly extraneous bad conduct. We're objecting that—on the grounds that it is not relevant, and if it is relevant, that is clearly outweighed by the prejudicial effect. There's been absolutely no evidence that would justify the inclusion at this stage of the trial of extraneous offenses in this case. In fact, the victim himself hasn't even testified, so we're objecting on those grounds.
>
> [THE STATE]: The Court has already ruled on this matter. Furthermore,

---

[49] *See, e.g., Moore v. State*, 530 S.W.2d 536, 537 (Tex. Crim. App. 1975) (finding that the harm stemming from the State's improper jury argument—which associated defendant with uncharged criminal conduct—was apparent from the jury's imposition of the maximum sentence for the charged offenses).

[Lopez's counsel] asked Karen Garcia if the defendant would ever do something like this, and at that time, I approached the Bench and he was allowed to go into it. So, on those grounds also, but this—this clearly goes to intent, motive, modus operandi, and we would argue that it's admissible.

THE COURT: I believe it's admissible. I mean, I want to think about the—whether the prejudicial effect outweighs the probative value. I mean, I'm—that's the part that troubles me, frankly.

[THE STATE]: I thought there had already been a court ruling.

THE COURT: Well, we discussed this, but it's a matter of a limine, you know, and I said we'd wait and see how the evidence came in.

[LOPEZ'S COUNSEL]: Judge, the reason I bring up the fact that the victim hasn't testified is because I expect, unless things have changed, that the victim is going to testify that he didn't know whether my client was wearing a condom or not.

[THE STATE]: He can testify—I disagree.

THE COURT: Well, I mean, if that's it—okay. The objection's overruled. Let's go. Come on, bring the jury back in.

Upon the jury returning to the courtroom, Avalos, guided by the State's questioning, testified that (1) he did not wear a condom when Lopez performed oral sex on him; (2) Lopez did not wear a condom when Lopez performed anal sex on him; and (3) Lopez did not inform him that he (Lopez) had HIV before they became sexually involved.

On appeal, Lopez argues that, pursuant to Texas Rule of Evidence 404(b), the trial court erred in admitting this testimony (hereinafter collectively referred to as "the extraneous acts"). We find that Lopez's Rule 404(b) objection is applicable to the admission of the extraneous acts,[50] and that the objection properly preserved this issue for

---

[50] *See Plante v. State*, 692 S.W.2d 487, 490 n.3 (Tex. Crim. App. 1985) (stating that "[t]he analysis of the admissibility of extraneous conduct is the same whenever the extraneous conduct reflects adversely on the character of the defendant, regardless of whether that conduct might give rise to criminal liability"); *Bishop v. State*, 837 S.W.2d 431, 435 (Tex. App.–Beaumont 1992) (rejecting State's claim that defendant's Rule 404(b) objection was inapplicable to the complained-of evidence—namely, testimony from defendant's

21

our review. We must now assess whether the trial court erred in admitting the extraneous acts.

## B. Did the Trial Court Err?

To be admissible, evidence must be relevant.[51] Evidence of other crimes, wrongs, or bad acts is not admissible to show character conformity but may be admissible for other purposes, such as establishing an elemental fact, establishing an evidentiary fact that leads to an elemental fact, or rebutting a defensive theory.[52] Rule 404(b) provides that evidence of other crimes, wrongs, or bad acts may be admissible for proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.[53] Further, although relevant evidence may be admissible under Rule 404(b), evidence may still be inadmissible under Texas Rule of Evidence 403.[54]

When performing a Rule 403 balancing test, a trial court must determine if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice.[55] In making this determination, the trial court should consider the following: (1) whether the ultimate issue was seriously contested by the opponent of the evidence; (2)

---

wife, who was not the complainant, discussing details of consensual sexual acts between them), *aff'd*, 896 S.W.2d 342 (Tex. Crim. App. 1993); *see also Atkins v. State*, No. 05-07-00586, 2008 Tex. App. LEXIS 5407, *12-17 (Tex. App.–Dallas 2008 July 23, 2008, pet. ref'd) (not designated for publication) (assessing, under Rule 404(b), trial court's admission of videotapes showing HIV-positive defendant having unprotected sex with consensual adults).

[51] TEX. R. EVID. 402.

[52] *Id.* 404(b); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (opinion on rehearing).

[53] TEX. R. EVID. 404(b).

[54] *Id.* 403.

[55] *Montgomery*, 810 S.W.2d at 389.

whether the State had other convincing evidence to establish the ultimate issue to which the disputed evidence was relevant; (3) the compelling nature, or lack thereof, of the evidence; and (4) the likelihood that the evidence was of such a nature as to impair the efficacy of a limiting instruction.[56] The trial court should also consider how much time the State will need to develop the extraneous offense evidence and the potential for the evidence to affect the jury in some irrational way.[57] We will reverse the trial court's ruling only upon a showing of a clear abuse of discretion.[58] An abuse of discretion is shown if the ruling was outside the zone of reasonable disagreement.[59]

In the instant case, the State argued at trial that the extraneous acts were admissible under Rule 404(b) to show Lopez's "intent, motive, [and] modus operandi."[60] With regard to Lopez's intent, the State sought to prove at trial that he *knowingly or intentionally* penetrated John's anus, and that he *knowingly or intentionally* caused John's penis to contact his mouth. Lopez did not claim at trial, nor did the evidence suggest, that he accidentally committed these acts; therefore, the inclusion of the extraneous acts was not necessary to shore up the State's case or disprove an otherwise innocent intent.[61] Furthermore, even if Lopez had made his intent an issue at trial (i.e., by admitting to the

---

[56] *Taylor v. State*, 920 S.W.2d 319, 322 (Tex. Crim. App. 1996); *Montgomery*, 810 S.W.2d at 392-93.

[57] *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999).

[58] *Wyatt v. State*, 23 S.W.3d 18, 26 (Tex. Crim. App. 2000); *Ransom v. State*, 920 S.W.2d 288, 299 (Tex. Crim. App. 1996); *Montgomery*, 810 S.W.2d at 390.

[59] *Montgomery*, 810 S.W.2d at 391.

[60] The State makes no attempt on appeal to defend the admission of the extraneous acts on these grounds, or any other grounds.

[61] *See Clark v. State*, 726 S.W.2d 120, 124 (Tex. Crim. App. 1987).

alleged contact with John while claiming the contact was accidental), we fail to see how the extraneous acts would be relevant in negating such a defense.

The State also argued at trial that the extraneous acts were admissible to show Lopez's motive. "[M]otive refers to an emotion that would provoke or lead to the commission of a criminal offense. Evidence to show motive is the circumstantial evidence that would appear to cause or produce the emotion."[62] On appeal, the State does not explain (1) how Lopez and Avalos's consensual sexual activity without a condom produced the emotion that provoked Lopez to sexually assault John, nor (2) how Lopez's failure to tell Avalos that he was HIV positive produced the emotion that provoked Lopez to sexually assault John. We see no relation between the extraneous acts and the State's efforts to establish Lopez's motive for committing the charged offenses. Accordingly, we find that the extraneous acts had no relevance as to motive.

Lastly, the State argued at trial that the extraneous acts were admissible to show Lopez's modus operandi. In *Owens v. State*, the court of criminal appeals discussed admitting extraneous offense evidence to show a defendant's modus operandi, stating:

> [T]he terms "modus operandi" or "methodology" refer to a defendant's distinctive and idiosyncratic manner of committing criminal acts. Evidence of a defendant's particular modus operandi is a recognized exception to the general rule precluding extraneous offense evidence, if the modus operandi tends to prove a material fact at issue, other than propensity.
>
> . . . .
>
> . . . When the State seeks to admit extraneous offense evidence under a theory of "system" or modus operandi, there must be a showing that the extraneous offense which was committed by the defendant was 'so nearly identical in method to the charged offense as to earmark them as the

---

[62] *Rodriguez v. State*, 486 S.W.2d 355, 358 (Tex. Crim. App. 1972).

24

handiwork of the accused. The State must show more than the mere repeated commission of crimes of the same type or class: The device used must be so unusual and distinctive as to be like a signature. If there is no sufficiently distinctive characteristic, then the relevancy of the evidence cannot outweigh its prejudicial value.[63]

The Ninth Court of Appeals' opinion in *Cooper v. State* is instructive to our resolution of this matter.[64] Cooper was convicted on two counts of aggravated sexual assault. One of the complainants, a female child, accused Cooper of using threats to make her submit to anal and vaginal intercourse. Cooper lived with the complainant and her mother for four years. At trial, the State had the complainant's mother testify about her relationship with Cooper—namely, her sexual involvement with him.[65] The mother testified, over Cooper's objection, that Cooper had anal sex with her. She further testified that she never wanted to engage in anal sex, but submitted to Cooper because of his forcefulness. Cooper argued on appeal that the trial court erred in admitting the mother's testimony. The court of appeals agreed with Cooper, and rejected the State's claim that the mother's testimony was admissible under Rule 404(b) because it went to Cooper's modus operandi. The court rejected this claim because the mother's testimony did not establish Cooper's "signature," and Cooper's identity was not an issue at trial.[66] The court also added the following: "[W]e are not prepared to concede that evidence of otherwise consensual sexual relations between an adult male and female, albeit involving anal intercourse, is relevant in the

---

[63] 827 S.W.2d 911, 914 (Tex. Crim. App. 1992) (citations and internal quotations and brackets omitted).

[64] 901 S.W.2d 757, 760-63 (Tex. App.–Beaumont 1995, pet. dism'd).

[65] *Id.* at 760.

[66] *Id.* at 761.

25

prosecution of said adult male for engaging in forcible sex acts perpetrated upon male and female children, albeit also involving anal intercourse."[67]

As was the case in *Cooper*, we cannot conclude that the extraneous acts—Lopez's practice of not using a condom while engaged in consensual sex with Avalos (an adult, long-term companion), and Lopez's failure to inform Avalos of his HIV-positive status—established Lopez's "signature" for sexually assaulting a child. Lopez's failure to wear a condom and disclose his HIV status with a sexual partner does not establish a signature because most sexual assaults committed by a male perpetrator likely occur without the use of a condom and without a discussion of the perpetrator's medical history.[68] To hold that Lopez's sexual conduct with Avalos and his alleged conduct with John are "so nearly identical in method as to constitute a 'system' would run the risk of qualifying almost any two crimes of the same class and against the same type of victim as a 'system.'"[69] Moreover, Lopez's identity was not an issue at trial. There was no indication that John had difficulty identifying Lopez as the individual that sexually assaulted him, thus calling into question the State's necessity of establishing Lopez's modus operandi. Accordingly, we find the extraneous acts were entirely irrelevant to establishing Lopez's modus operandi for sexually assaulting a child.

We find there was no admissible purpose for the admission of the extraneous acts

---

[67] *Id.* at 761-62.

[68] *See id.* at 915-16 ("We recognize that there will always be similarities in the commission of the same type of crime. That is, any case of robbery by firearms is quite likely to have been committed in much the same way as any other. What must be shown to make the evidence of the extraneous offense admissible is something that sets it apart from its class or type of crime in general, and marks it distinctively in the same manner as the principal crime.")

[69] *Id.* at 915.

26

under Rule 404(b). The extraneous acts—much like other portions of Avalos's testimony admitted without objection at trial—were presented to show the character of Lopez in order to show that he acted in conformity therewith. Because this is exactly what Rule 404(b) prohibits, we find that the trial court abused its discretion in admitting the extraneous acts.[70]

## C. Was the Error Rendered Harmless?

### 1. The State's Opening Statement

The State contends on appeal that the error was rendered harmless for a number of reasons. Addressing the State's first contention requires us to begin with a review of the State's opening statement at trial, which is where the extraneous acts were first discussed:

[THE STATE]: We are going to bring many witnesses to you, and at the close—we are also going to share with you that the defendant knew since 1996 that he was HIV positive. You will hear from an ex-lover of the defendant, Jeremiah Avalos, that the defendant—

[LOPEZ'S COUNSEL]: Judge, we—we would object. Counsel is attempting to insert extraneous offenses in this matter. We object under 403. We object under 401. It is not relevant and its prejudicial effect clearly outweighs any relevance and it's certainly not been raised. We object to extraneous—

THE COURT: Overruled. Overruled.

[THE STATE]: Okay. Jeremiah was younger than the defendant, by ten years, and Jeremiah will share that starting when he was about seventeen or eighteen, the defendant engaged in anal sex with him and that the defendant enjoyed being the one to put his penis in the anus of Jeremiah Avalos and that the defendant repeatedly had anal sex with Jeremiah without using any kind of protection.

[LOPEZ'S COUNSEL]: Again, we object, Your Honor. Same reasons,

---

[70] *See generally Montgomery*, 810 S.W.2d at 391 ("Where the appellate court can say with confidence that by no reasonable perception of common experience can it be concluded that proffered evidence has a tendency to make the existence of a fact of consequence more or less probable than it would otherwise be, then it can be said the trial court abused its discretion to admit that evidence. Moreover, when it is clear to the appellate court that what was perceived by the trial court as common experience is really no more than the operation of a common prejudice, not borne out of reason, the trial court has abused its discretion.").

27

extraneous offenses. It's not been raised, 403, 401, Judge.

THE COURT: Overruled.

[THE STATE]: That the defendant repeatedly had anal sex with Jeremiah Avalos and did not tell Jeremiah Avalos that he was HIV positive. . . .

The Texas Court of Criminal Appeals has held that "[a]n objection that such evidence is . . . an 'extraneous offense' . . . ought ordinarily to be sufficient under the circumstances to apprise the trial court of the nature of the complaint."[71] Accordingly, contrary to the State's argument on appeal, Lopez did apprise the trial court that he was objecting under Rule 404(b) when he twice objected and stated "extraneous offenses." Assuming, *arguendo*, that Lopez did fail to apprise the trial court of his Rule 404(b) objection, we still would not conclude this rendered harmless Avalos's later discussion of those acts. The doctrine of harmless error (or "waiver") is applicable to a situation where a court overrules "an objection to evidence after the same evidence has been admitted without objection."[72]

> The effect of the earlier-admitted evidence on appellate review of the ruling is clear: Overruling the objection usually will not be reversible error. "It is well established that the improper admission of evidence does not constitute reversible error if the same facts are shown by other evidence which is not challenged."[73]

The State's opening statement was not "other evidence" that the jury could consider in determining Lopez's guilt or innocence;[74] therefore, Avalos's discussion of the extraneous

---

[71] *Id.* at 387.

[72] *Leday*, 983 S.W.2d at 717.

[73] *Id.* (quoting *Crocker v. State*, 573 S.W.2d 190, 201 (Tex. Crim. App. 1978)).

[74] *See Fuller v. State*, 73 S.W.3d 250, 264 (Tex. Crim. App. 2002) (stating that opening and closing arguments are not evidence).

28

acts, which was evidence the jury could consider, was not rendered harmless by the State's opening statement.

## 2. Karen Garcia's Testimony

Karen Garcia, Lopez's friend, was the State's first witness. On direct examination, the State did not question Garcia as to whether she had knowledge about Lopez's condom usage with Avalos. Furthermore, the State did not question Garcia as to whether, to her knowledge, Avalos was aware of Lopez's HIV status from the beginning of their sexual relationship. While under cross-examination by Lopez's counsel, however, Garcia stated the following:

> Q. [LOPEZ'S COUNSEL]. Okay. Now, Jeremiah—Jeremiah knew that [Lopez] had HIV, didn't he?
>
> A. [GARCIA]. Yes.
>
> Q. I mean, he knew it pretty much from the start, didn't he?
>
> A. Yes.
>
> Q. And Jeremiah, even though he knew that [Lopez] had HIV, still slept with him?
>
> A. Correct.
>
> Q. In fact, repeatedly and over time knowing basically from the start that he had HIV, isn't that true?
>
> A. True.
>
> Q. In fact, wouldn't Jeremiah even go to the doctor with him?
>
> A. I'm not too sure about that, but, you know, I knew he knew that, you know, [Lopez] was sick.

The State's brief, in setting forth arguments for why Avalos's testimony was rendered harmless, draws attention to the fact that "Lopez's attorney himself had solicited

29

testimony from Karen Garcia that Avalos knew about Lopez's HIV status from the beginning."  The brief then states the following:

> Accordingly, by failing to object to prior instances where evidence came in without any 404(b) objection, Lopez waived any complaint concerning his own sexual orientation and HIV status, and his sexual relationship with Avalos, including both jury argument and testimony solicited by Lopez's attorney as to whether Avalos knew about Lopez's HIV status before they began that sexual relationship.

> Lopez thus waived any error when the prosecutor later asked the same general questions of Avalos, and specifically whether Lopez told Avalos about his HIV status before engaging in unprotected sex with him.

The State's argument is less than clear.  Nevertheless, we perceive the State's argument as raising one of two possible contentions.

The first possible contention is that Karen Garcia's testimony is same or similar evidence of the extraneous acts discussed by Avalos, thus rendering Avalos's testimony harmless.[75]  We find this contention unpersuasive.  Garcia's testimony that Avalos was *aware* of Lopez's HIV status from the start of their sexual relationship, and Avalos's testimony that he was *unaware* of Lopez's HIV status at the start of their sexual relationship, is not same or similar evidence.  For an evidentiary error to be rendered harmless by same or similar evidence, the latter must complement the former—rather than conflict with it—in order to prove the same fact.[76]  The State's second possible contention is that Karen Garcia's testimony provides an independent basis for admitting Avalos's testimony, for even if Avalos's discussion of the extraneous acts was impermissible

---

[75] *See generally Leday*, 983 S.W.2d at 717-18 (explaining that "when a court has overruled an objection to evidence, the ruling usually will not be reversible error when the same evidence is subsequently admitted without objection").

[76] *See Nicholas v. State*, 502 S.W.2d 169, 174 (Tex. Crim. App. 1973).

evidence under Rule 404(b), the evidence was permissible to rebut Garcia's contradictory testimony. We find this contention unpersuasive, as well.

If the State merely intended to rebut Garcia's testimony through Avalos's extraneous-acts testimony, the trial court should have sustained Lopez's Rule 401 and Rule 403 objections to Avalos's testimony. As already explained, Avalos's discussion of the extraneous acts was irrelevant to Lopez's intent, modus operandi, motive, or any other admissible purpose articulated under Rule 404(b). The extraneous acts were irrelevant to rebutting a defensive theory that Lopez raised at trial. Moreover, the extraneous acts were irrelevant to rebutting evidence of Lopez's good character. Garcia's testimony that Avalos was aware of Lopez's HIV status was not evidence of Lopez's good character. Though Garcia testified that Avalos knew of Lopez's HIV status at the start of their sexual relationship, she never specified whether Avalos's knowledge stemmed from Lopez, another individual, or random circumstance.

The only "relevant" purpose of Avalos's extraneous-acts testimony was to show that Garcia was mistaken in her belief as to when Avalos became aware of Lopez's HIV status. Whether or not Garcia had a mistaken belief about this matter, however, was irrelevant to Lopez's trial; therefore, there was no relevant purpose behind Avalos's discussion of the extraneous acts. If there was any relevance to this discussion, that relevance was substantially outweighed by the danger of unfair prejudice against Lopez.

We further find that the State cannot use Garcia's testimony to justify the admissibility of Avalos's testimony because Garcia's testimony was rebuttal evidence. To

31

understand how we arrive at this point, we begin with a discussion of *Drew v. State*.[77]  In

*Drew*, the court of criminal appeals determined that the trial court erred in permitting the

State to present extraneous offense evidence over Drew's objection, and held that Drew

did not "open the door" to the extraneous offense evidence by later presenting rebuttal

evidence.[78]  The court of criminal appeals explained:

> By protesting that [extraneous offense] evidence at the first opportunity, however, appellant indicated an unwillingness to "play ball." Moreover, once he objected at the outset, any evidence of like kind which appellant presented to refute evidence admitted over his objection should not be considered belated agreement to admit specific conduct in aid of jury discretion.  An accused cannot in fairness be expected to "forfeit" rebuttal of damaging evidence admitted over his objection in order to preserve error on appeal.   Rather, we will presume appellant is "playing the game under protest."[79]

In holding that rebuttal evidence does not "open the door" to the evidence it seeks to

refute, *Drew* assessed a situation in which the evidence being rebutted was presented

*before* the rebuttal evidence.  *Drew*'s holding, however, can be logically applied to certain

situations in which the evidence being rebutted is presented *after* the rebuttal evidence.

We demonstrate this point through the following hypothetical.

Imagine that at a trial's guilt phase, the trial court, over the defendant's objection,

improperly permits the State to present extraneous offense evidence through its witness,

Sam.  During the defense case-in-chief, the defendant presents rebuttal evidence to meet,

explain, or destroy Sam's testimony.  After the defense case-in-chief, the trial court permits

the State, over the defendant's objection, to reiterate the same extraneous offense

---

[77] 777 S.W.2d 74 (Tex. Crim. App. 1989).

[78] *Id.* at 76.

[79] *Id.*

evidence through Bob, a rebuttal witness. If the defendant appealed the trial court's admission of the extraneous offense evidence, the State could not reasonably argue that the defendant's rebuttal evidence "opened the door" to Bob's testimony, which was introduced after the rebuttal evidence. To believe otherwise would unfairly result in defendants being compelled to forfeit rebuttal of damaging evidence admitted over objection in order to preserve error on appeal.[80]

The instant case is factually similar to the above hypothetical, with one critical distinction. In the hypothetical, the defendant's rebuttal evidence responds to actual evidence (i.e., Sam's testimony); in the instant case, Lopez's rebuttal evidence (i.e, Garcia's testimony) responds to the State's opening statement, which is not evidence.[81] The question that confronts us is whether this distinction is significant. Does this distinction cause Garcia's testimony to open the door to Avalos's extraneous-acts testimony? After much consideration, we answer this question in the negative.

In *Powell v. State*, the court of criminal appeals determined that the State could introduce extraneous offense evidence in its case-in-chief to rebut a defensive theory that was raised in the defendant's opening statement.[82] The court of criminal appeals later made the same determination in *Bass v. State*,[83] explaining therein:

> Although a defensive opening statement is not itself evidence, it does inform the jury of the nature of the defenses relied upon and the facts expected to be proved in their support. When, as here, the defense chooses

---

[80] *See id.*

[81] *See Fuller*, 73 S.W.3d at 264.

[82] 63 S.W.3d 435, 439 (Tex. Crim. App. 2001).

[83] 270 S.W.3d 557, 563 (Tex. Crim. App. 2008).

33

to make its opening statement immediately after the State's opening statement, the State may reasonably rely on this defensive opening statement as to what evidence the defense intends to present and rebut this anticipated defensive evidence during its case-in-chief as opposed to waiting until rebuttal.[84]

If the State can present extraneous offense evidence to rebut anticipated defensive evidence because it "reasonably rel[ied] on [a] defensive opening statement as to what evidence the defense intend[ed] to present,"[85] then a defendant should similarly be able to rebut anticipated extraneous offense evidence based on the defendant's reasonable reliance on the State's opening statement as to what evidence the State intends to present. A defendant arguably has greater reason to rely on the State's opening statement. When the State discusses an extraneous offense in its opening statement, the State's failure to present evidence of that offense renders the State's opening statement improper, and risks affording the defendant a basis for retrial.[86] This being the case, it is reasonable for a defendant to presuppose that the State would not risk violating his substantial rights by referencing extraneous offenses that it does not fully intend to present evidence on.

Moreover, though the State's opening statement is not evidence, it is disingenuous to believe that matters raised therein are incapable of harming a defendant. Courts have cautioned that a "prosecutor should not use the opening statement as an *opportunity to poison the jury's mind against the defendant* or to recite items of highly questionable

---

[84] *Id.* at 563 n.7 (citations and internal quotations omitted).

[85] *Id.*

[86] *See United States v. Thomas*, 114 F.3d 228, 248 (D.C. Circ. 1997) ("[W]here the prosecutor informs the jury that the government will produce certain evidence to show a defendant's guilt and then, without good cause, fails to do so, the prosecutor fails to give a proper opening statement to the jury. Otherwise, the risk to the defendant is that the jury's mindset will be tainted, resulting in an unfair trial. The risk to the government is it may have to retry the case.").

value."[87]  The State's references to the extraneous acts in the instant case, as will be discussed later in this opinion, had the effect of portraying Lopez as an individual of generally bad character—specifically, a callous and exploitative person with a reckless disregard for human life.  We cannot fault Lopez's counsel for wanting to rebut this portrayal at the earliest opportunity, rather than allow the jurors' minds to retain this portrayal (untarnished by rebuttal) while entertaining John's testimony and assessing John's credibility.  The fact of the matter is that Lopez's counsel had no obviously preferable means of responding to the State's opening-statement discussion of the extraneous acts.  Even if Lopez's counsel had not presented rebuttal evidence through Garcia, and the State had not presented evidence of the extraneous acts, Lopez's counsel would still confront a complicated decision regarding how best to respond to the State's opening statement.  As explained by one federal court of appeals:

> It is true, as the government points out, that during closing arguments the defense is free to call to the jury's attention the fact that the government has failed to present evidence that it promised, and to that extent its case is suspect, being weaker than the jury might originally have thought based on the prosecutor's opening statement.  But this approach places an unfair burden on the defense in cases . . . where . . . defense counsel may wish to avoid reminding the jury of activities for which no evidence was offered at trial.[88]

In conclusion, the State's opening statement informed the jury as to how the State would prove Lopez committed the charged offenses, and it made clear the State's intent to rely on the extraneous acts to accomplish this objective.  Under *Powell* and its progeny,

---

[87] *United States v. Brockington*, 849 F.2d 872, 875 (4th Cir. 1988) (emphasis added; citations and internal quotations omitted) (citing *United States v. DeRosa*, 548 F.2d 464, 470 (3d Cir. 1977)).

[88] *Thomas*, 114 F.3d at 248.

we find it difficult to discern why Lopez could not rely on this opening statement as to what evidence the State intended to present, and rebut this anticipated prosecutorial evidence during the State's case-in-chief as opposed to waiting until his case-in-chief. We thus consider Garcia's testimony about Avalos to be proper rebuttal evidence. Accordingly, Garcia's testimony did not open the door to the extraneous acts because the former represented Lopez playing, under protest, a game that the State initiated in its opening statement.[89]

### 3. Avalos's Unobjected-to Testimony

The State further contends any error was rendered harmless for the following reason:

> [L]ong before Avalos took the stand, the jury had already heard testimony, without any 404(b) objection, that Lopez was gay, that he was HIV positive, and that he and Avalos had been in a long-term homosexual relationship. In addition, they heard unobjected-to argument that Lopez did not tell Avalos that he was HIV positive when they were having unprotected anal sex.

The State is incorrect in asserting that the jury "heard unobjected-to argument that Lopez did not tell Avalos that he was HIV positive when they were having unprotected anal sex." Lopez's counsel raised a Rule 404(b) objection to such testimony before it was admitted through Avalos. The trial court heard counsel's objection outside the presence of the jury, thus eliminating the necessity of counsel repeating the objection when the court admitted

---

[89] See Drew, 777 S.W.2d at 76. If we have misapplied Powell's holding in the instant case, we wonder what would result if Lopez's counsel had not proffered rebuttal testimony from Garcia, but had simply rebutted the extraneous acts during Lopez's opening statement. If this had occurred, would Powell operate to defend the State's admission of the extraneous acts? Furthermore, we observe that if Garcia's testimony did open the door to Avalos's testimony, the door would only be open to Avalos testifying about whether he was aware of Lopez's HIV status at the start of their sexual relationship. The door would not be open to testimony on Lopez's and Avalos's condom usage together, for Garcia never testified on this matter.

36

the evidence.[90] The State emphasizes that Avalos testified, without objection, that he had oral and anal sex with Lopez, and that he did "[p]retty much everything in the book" with Lopez. This testimony—along with Avalos's testimony that Lopez is a homosexual who is HIV-positive—is not "same or similar" evidence of the extraneous acts, however, because the former is critically distinguishable in two critical respects: (1) it makes no reference to the sex being unprotected; and (2) it makes no reference to Lopez subjecting Avalos to the risk of acquiring HIV from him without Avalos's knowledge.[91] Accordingly, we find the trial court's error in admitting the extraneous acts was not rendered harmless.

## D. Assessing the Error's Potential Harm

The admission of the extraneous acts constitutes non-constitutional error,[92] which again means that we will disregard the error if it does not affect Lopez's substantial rights.[93] As fully explained in our discussion of Lopez's first issue, substantial rights are not affected by the erroneous admission of evidence if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect.[94] The influence and harm that may result from a trial court's admission of a defendant's extraneous offenses or bad acts was fully discussed by the court of criminal

---

[90] TEX. R. EVID. 103(a)(1) ("When the court hears objections to offered evidence out of the presence of the jury and rules that such evidence be admitted, such objections shall be deemed to apply to such evidence when it is admitted before the jury without the necessity of repeating those objections.").

[91] *See generally Thomas v. State*, 621 S.W.2d 158, 164 (Tex. Crim. App. 1981) (reasoning inadmissible evidence was rendered harmless because same or similar evidence was introduced elsewhere without objection).

[92] *See Ladd v. State*, 3 S.W.3d 547, 568 (Tex. Crim. App. 1999) (applying non-constitutional harm analysis to defendant's claim that trial court erred in admitting extraneous offense evidence).

[93] TEX. R. APP. P. 44.2(b).

[94] *Motilla*, 78 S.W.3d at 355.

appeals in *Abdnor v. State*:

> It is now axiomatic that a defendant is to be tried only on the crimes alleged in the indictment and not for being a criminal generally. Thus, evidence of extraneous offenses or bad acts committed by the defendant may not be introduced during the guilt/innocence portion of the trial to show the defendant acted in conformity with his criminal nature. This is because evidence of extraneous offenses is inherently prejudicial, tends to confuse the issues in the case, and forces the accused to defend himself against charges which he had not been notified would be brought against him. . . .
>
>     . . . .
>
> We have consistently acknowledged that the introduction of extraneous offenses to the jury is inherently prejudicial, and hence, harms the defendant, because it requires the defendant to defend against not only the offense charged but also his uncharged actions. The admission of extraneous offenses also prejudices the defendant because of the jury's natural inclination to infer guilt to the charged offense from the extraneous offenses. . . .
>
> . . . [T]he unlimited introduction of extraneous offenses similar to the charged offense harms a defendant because the jury will inevitably presume guilt from the extraneous offenses to the charged offense. We have subsequently found in a number of cases that the admission of extraneous offenses similar to the charged offense, and admitted without limiting instructions, harmed the defendant because the jury was allowed to convict on the assumption that the defendant was acting in conformity with a criminal character.[95]

Because extraneous offense evidence carries with it the inherent risk that a defendant may be convicted because of his propensity for committing crimes generally—i.e., his bad character—rather than for the commission of the charged offense, courts have historically been reluctant to allow evidence of an individual's prior bad acts or extraneous offenses.[96]

In the instant case, the jury heard significant discussion of Lopez's extraneous acts

---

[95] 871 S.W.2d 726, 738-39 (Tex. Crim. App. 1994) (footnotes and internal quotations omitted).

[96] *Owens*, 827 S.W.2d at 914.

from the State, and, as a result, from Lopez. From the beginning of Lopez's trial, the State established its intent to make the extraneous acts an issue by referring to them during opening statement, wherein the jury was informed that Lopez "repeatedly had anal sex with Jeremiah without using any kind of protection," and that Lopez "did not tell Jeremiah Avalos that he was HIV positive." This required Lopez to rebut the extraneous acts during his cross-examination of the State's first witness, Karen Garcia, who testified that Avalos had always been aware of Lopez's HIV status. The State's fifth witness was Avalos, who testified about the extraneous acts over Lopez's objection. Avalos's testimony relating to the extraneous acts consisted of the following:

Q [THE STATE]. Okay. And let me ask you, when you began engaging in anal sex with [Lopez], did he like to use a condom?

A. There was [sic] no condoms used.

Q. Okay. He did not use a condom?

A. Huh-uh.

Q. Okay. You never used a condom with him?

A. I'm pretty—say like maybe once, twice, but never consistently throughout the relationship.

Q. Okay. Why didn't he use a condom, did he ever tell you?

A. It was never brought up. It was just from the get-go never done, so just never did it.

Q. Okay. When he was performing oral sex on you, were you wearing a condom?

A. No, ma'am.

Q. Did there come a time in your relationship after you were having anal and oral sex with him that he told you or did you ever learn he was HIV positive?

39

A. No, ma'am.

Q. Okay. When did you finally learn he was HIV positive?

A. The way it came about was we were in my bedroom, me, my mother and my brother, and my brother had blurted out that [Lopez] had AIDS and, I don't know, it came to a shock because he never told me. I found out through my brother because my cousin is his sister's best friend and that's how it came across each other that he had AIDS and it got back to me.

Q. Okay. Did you confront the defendant?

A. Yes, ma'am. I confronted him about it. He never told me yes or no. It was just understood that he did. Never apologized or nothing like that for it, so. . .

Q. Okay. When you learned he was HIV positive, did you assume that you were HIV positive?

A. Yeah. I thought my life was ruined after that. I mean, there was no need for me to go get tested or nothing like that 'cause I was with him for so long. I thought, hey, I already been in here for three years already, I know I have it. I mean, there was a lot of unprotected sex between us, so I just thought I had it. And due to my best friend, she told me that just go get tested.

     . . . .

Q. Okay. So did you then continue to be with him—

A. Yes, ma'am.

Q. —thinking you must be HIV positive, too?

A. Yes, ma'am.

Q. What were the exact words you used with me about how you felt about yourself?

     . . . .

A. That my life was over. There was nothing else looking forward to, just belong with him, I mean. I don't remember my exact words, but I know it was pretty much to the effect of nothing else left to live for. I mean, it was over.

Q. Okay. So you continued to be in a relationship with him?

40

A. Uh-huh, yes, ma'am.

Q. Okay. And at some point, did you finally go to be tested for HIV?

A. Yes. At the end of our relationship, I did do that and it came out negative. So I knew it was finito with him.

Q. Okay. Were you surprised that you were negative?

A. To the point of tears.

Q. Okay. And how many times would you go to re-test yourself?

A. Every three to four months, and then after a year passed, the—one of the workers over there had told me I could come back every six months because the results were coming out pretty much clear.

Q. Okay. Did one of the workers kind of tell you to calm down?

A. Uh-huh.

Q. That you didn't have to go that much to be tested?

A. Yes, ma'am.

Lopez then sought to rebut the extraneous acts through his cross-examination of Avalos and his own direct examination, wherein Lopez sought to establish that his HIV status was always known to Avalos. Lopez continued to rebut the extraneous acts during closing argument, at which point his counsel told the jury:

> Jeremiah Avalos. Now, here we have unrequited love, or, perhaps, lust. I don't know. But he's so oblivious to [Lopez]'s illness that he's never noticed the medications in his refrigerator, or is it just that he doesn't use butter? You know, I don't know. But you remember how he said, you know, gosh, you know, occasionally he would use a condom. Now, ladies and gentlemen—well, rephrase that, ladies, if you could not bear children and all of a sudden your husband said he was going to use a condom, wouldn't light bulbs go off? Would you have some questions? Would you wonder why? But, apparently, that escapes Avalos' attention.
>
> As I said, this is unrequited love. [Lopez] was rejected by Jeremiah

41

or Jeremiah—[Lopez] rejected Jeremiah and now he's going to pay him back. . . .

The State then responded to Lopez's closing by discussing the extraneous acts in its rebuttal closing argument, stating:

> Jeremiah was a virgin to anal sex, and he was a virgin to gay sex, until the defendant. Jeremiah, told us that the defendant did not tell him, at first, that he was HIV positive and has unprotected sex with Jeremiah without telling Jeremiah that he was HIV positive. As you recall, Jeremiah had to hear, I believe, through a cousin. And when he confronted the defendant, the defendant said, Oh, — didn't really say much.
>
> Jeremiah, at that point, being the naive 17, 18 year old that he was, decided, I must also be HIV positive, because we've had anal sex so many times without a condom. So, at that point, he just didn't get tested, until they broke up, and then he was tested and he was very lucky and was not HIV positive. But this defendant even lied to Jeremiah.

We *first* observe that the extraneous acts clearly prejudiced Lopez by forcing him to defend against the offenses charged *and* the uncharged actions. Time was spent rebutting the extraneous acts during Garcia's, Avalos's, and Lopez's testimony, as well as during closing argument. Rebutting the extraneous acts to this extent was necessary because the State essentially presented Avalos as Lopez's second victim. The State questioned Avalos about the emotional toll placed upon him as a result of Lopez's failure to disclose his HIV status. Avalos told the jury that he felt his "life was ruined," his "life was over," "[t]here was nothing else to look forward to," and "nothing else to live for." The State's questioning prompted Avalos to testify that he was "[t]o the point of tears" when he learned he did not have HIV, but was plagued with worry during the time he continued to be retested for the virus. During closing argument, the State portrayed Avalos as one of Lopez's victims, describing him as a "naive 17 or 18 year old" who "was a virgin to gay sex, until the defendant."

42

*Second*, the State's actions created the very real possibility that a juror would lose sight of specific issues he or she was called upon to decide, and would instead convict and punish Lopez for the extraneous acts.[97]  Lopez's extraneous acts gave the jury two things to consider:  (1) the harm that was (and could have been) inflicted upon Avalos; and (2) the harm that could be inflicted upon others should Lopez continue to have consensual sex without a condom while failing to inform his sexual partners of his HIV status.  The State brought the latter consideration to the forefront of the jury's attention at two points in its closing argument.  The first point occurred when the State raised the improper jury argument discussed earlier, wherein the State suggested that Lopez had sexually assaulted John because of a failed sexual encounter with someone earlier that day.  This argument invited the jury to speculate that Lopez engages in casual sexual encounters, which would in turn invite the jury to speculate as to whether Lopez would silently subject his partners to the risk of contracting HIV.  The second point in the closing was more direct; it was the final message the State had for the jury:  "Lastly, the very last thing I'd like to leave with you is that your guilty verdict will keep this predator, chicken hawk off our streets and prevent him from further contributing to the increase in the epidemic of AIDS."

*Third*, it is conceivable that the jury improperly relied on the extraneous acts—specifically, Lopez's practice of not using a condom during sexual activity with Avalos—to find beyond a reasonable doubt that Lopez did not use a condom in the course of sexually assaulting John.  The State sought to prove to the jury that Lopez failed to wear a condom during the sexual assault in order to establish the aggravated element of the

---

[97] *See Montgomery*, 810 S.W.2d at 397.

charged offenses.  And the State's direct examination of Avalos—composed of five questions relating to Lopez's condom usage with Avalos—clearly demonstrated the State's intent to utilize the extraneous acts to accomplish this objective.

*Fourth*, Lopez's alleged failure to inform Avalos of his HIV status prior to engaging in sexual activity evidenced Lopez's reckless disregard for human life in the course of satisfying his sexual desires—a reflection undiminished by the fact that Avalos did not acquire HIV.[98]  Once the extraneous acts were before the jury, the State emphasized Lopez's disregard by having Avalos testify that he never received an apology from Lopez, and by later repeating that testimony during closing argument.  Placed in the context of a trial for aggravated sexual assault of a child, such evidence was calculated to weigh heavily on the jurors' minds.[99]  Under the facts of this case, the admission of Avalos's testimony regarding the extraneous acts, admissible for no other purpose than character conformity, may have had the practical effect of prejudicing any defense raised by Lopez regarding John's credibility.  Such an effect would have been detrimental to Lopez, who sought to discredit John at trial by pointing out factual variances in his outcries, and by suggesting that John was motivated to fabricate the assault to avoid being schooled in the Alternative Education Program.

*Fifth*, the extraneous acts adversely affected Lopez's credibility because the acts reflected Lopez's capacity to lie.  The State made sure to remind the jury in its closing that Lopez "even lied to Jeremiah."  This point was significant for the State in discrediting

---

[98] *See also Atkins*, 2008 Tex. App. LEXIS 5407, at *22.

[99] *See Blakeney v. State*, 911 S.W.2d 508, 517 (Tex. App.–Austin 1995, no pet.).

44

Lopez, for if Lopez was capable of lying to his long-term partner on a matter that put his partner's life at jeopardy, the jury could infer that Lopez was more than capable and willing to lie to them about the charges against him. The extraneous acts indicated to the jury that Lopez is not truthful when his sexual activity is at issue.

The significance of this final point, however, is arguably mitigated by the fact that the jury had reason to question Lopez's truthfulness even if the extraneous acts were not admitted. Garza, the investigator, testified that he interviewed Lopez in the course of his investigation, from which he obtained a written statement from Lopez stating the following:

> I have been asked if I know a young man by the name of [John] and I do not know who that person is. I was told that he has made an allegation that in June 2004 I gave him a ride in my white Dodge Intrepid from a bus stop to some friends' house on Franklin Street in Corpus Christi. I was also told that [John] later called my cell phone and asked me to go pick him up. I was told that he stated I took him to an apartment (either 2016 or 2006) at the Sutton Place Apartments where I gave him some liquor. He claims that he passed out and I had oral sex with him and possibly anal sex.

> I do not recall the name of [John] and I do not remember meeting anyone by that name. I would never pick someone up who I have never met before from a bus stop. I am not in the habit of doing that. I did not have oral sex or anal sex with [John] or anyone else. . . .

> . . . I date girls and I do not go out with guys. I do not know why this person would say that I did this to him because I did not do this to him. I did stay in apartment #1705 at the Sutton Place Apartments. The apartment was being leased by my friend, Karen Garcia. During the month of June 2004 I would occasionally go and spend the night. She later let me take over the lease on the apartment. I began to live there permanently about mid July 2004. . . .

Lopez testified at trial that he lied about his sexual preference in the statement because he did not know Garza and he is a private person. Lopez also testified that, at the time the statement was made, he did not remember hanging out with John, nor fully moving into the Sutton Place Apartments in June 2004 (rather than "mid July"), because more than three

months had transpired since those events. In addition to the statement, Lopez's cell phone records revealed that, on the night in question, outgoing calls were made from his phone late into the night. Lopez, however, testified that he went to sleep before those calls were made, and neither he nor John claimed responsibility for the calls.

## E. Was the Error Harmful?

"We are not concerned here with whether there was sufficient evidence on which [Lopez] could have been convicted without the evidence complained of. The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction."[100] As the United States Supreme Court explained in *Kotteakos v. United States*:

> [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.

The Supreme Court has defined "grave doubt" to "mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error."[101] If the reviewing court is unsure whether the error affected the outcome, the court should treat the error as harmful, that is, as having a substantial and injurious effect or influence in determining the jury's verdict.[102]

Due to the five aforementioned concerns and the reasoning expressed therein, we

---

[100] *Fahy v. Connecticut*, 375 U.S. 85, 88 (1963).

[101] *O'Neal v. McAninch*, 513 U.S. 432, 434 (1995).

[102] *Id.*

46

have a "grave doubt" that the jury's guilty verdict was free from the substantial influence of the extraneous acts. The evidence of guilt in this case is not overwhelming—there was no physical evidence and Lopez and John were the only witnesses to the alleged assault. The record reveals that while the jury was deliberating Lopez's guilt or innocence, two jury notes were sent to the trial court requesting guidance on the meaning of "reasonable doubt"—possibly reflecting the difficulty some jurors had in finding Lopez guilty. In this case, as in almost any case, "[i]t is difficult to determine what evidence influenced the jury in reaching [its] criminal verdict, without such a judicial incursion into the mental processes of jurors."[103] This reality, coupled with the extraneous acts' great potential to disrupt the juror's orderly evaluation of the evidence, causes us to seriously question whether the jurors were properly able to apply law to facts in order to reach a just verdict.[104]

> Finally, while in no way attempting to impugn the integrity of the prosecuting attorneys throughout the State of Texas, holding such error harmless under the circumstances in the record before us could be interpreted as a signal to even the most well-intentioned prosecutor that, given the inherent subjectivity of harmless error analysis, any alleged perpetrator of such a repulsively violent crime deserves to be prosecuted as aggressively as the "law allows." We cannot deny nor fault this type of prosecutorial rationalization, but neither can we permit this Court to be an indirect participant in it.[105]

Unsure whether the erroneous admission of the extraneous acts affected the jury's verdict, we are obligated to treat the error as harmful. Lopez's third issue is therefore

---

[103] *Alvarado v. State*, 775 S.W.2d 851, 857 (Tex. App.–San Antonio 1989, pet. ref'd).

[104] *See generally Harris v. State*, 790 S.W.2d 568, 587-88 (Tex. Crim. App. 1989) ("[T]he reviewing court should focus not on the weight of the other evidence of guilt, but rather on whether the error at issue might possibly have prejudiced the jurors' decision-making; it should ask not whether the jury reached the correct result, but rather whether the jurors were able properly to apply law to facts in order to reach a verdict.").

[105] *Bishop*, 837 S.W.2d at 436-37 (citation omitted).

sustained.

## V. Cumulative Harm

The court of criminal appeals has stated that "[a] number of errors may be found harmful in their cumulative effect."[106] In the instant case, we have already ascertained that the error raised in Lopez's third issue, by itself, creates a "grave doubt" as to whether the jury's guilty verdict was free from the substantial influence of that error. Nevertheless, we observe that this doubt becomes more grave when we consider the cumulative harm of the errors discussed in Lopez's first, third, and fifth issue.

## VI. Conclusion

"Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly."[107] With this tenet in mind, we reverse the trial court's judgment and remand the case for a new trial.[108]

LINDA REYNA YAÑEZ,
Justice

Publish. Tex. R. App. P. 47.2(b).
Opinion delivered and filed this the
26th day of March, 2009.

---

[106] *Feldman v. State*, 71 S.W.3d 738, 757 (Tex. Crim. App. 2002).

[107] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[108] Our disposition obviates the necessity for discussion of Lopez's second and fourth issue. These issues, which concern the denial of a motion for new trial and an error at the punishment phase of Lopez's trial, would neither add to our cumulative harm analysis, nor afford Lopez any greater relief than already afforded herein.

48