

## NUMBER 13-11-00719-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

JUAN GARZA A/K/A JJ GARZA,                                      Appellant,

v.

THE STATE OF TEXAS,                                            Appellee.

On appeal from the 214th District Court
of Nueces County, Texas.

## MEMORANDUM OPINION

### Before Justices Garza, Benavides and Perkes
### Memorandum Opinion by Justice Garza

A jury found appellant, Juan Garza a/k/a J.J. Garza, guilty of capital murder of a

child under the age of six, *see* TEX. PENAL CODE ANN. § 19.03(a)(8) (West Supp. 2011).[1]

---

[1] We note that the most recent amendment to the statute, which substituted "10 years of age" for "six years of age" is not applicable in this case, as the offense in this case was committed prior to the effective date of the amendment. *See* Act of June 17, 2011, 82nd Leg., R.S., ch. 1209, § 1, 2011 Tex. Sess. Law. Serv. (West) (current version at TEX. PENAL CODE ANN. § 19.03(a)(8) (West Supp. 2011)). The

The State did not seek the death penalty, and the trial court assessed punishment at life imprisonment without parole. *See id.* § 12.31(a)(2) (West 2011). By five issues, appellant contends that: (1) the trial court erred in admitting certain evidence, including: (a) that he was fired by Walmart for stealing (issue one); (b) the testimony of a former girlfriend regarding the abusive nature of their relationship (issue two); and (c) the video recorded statements of two State witnesses (issues four and five); and (2) there was insufficient non-accomplice evidence to support his conviction (issue three). We affirm.

## I. BACKGROUND

Appellant was convicted of killing Texas Nathaniel Ruiz, the twenty-one-month-old son of Lorraine Rodriguez, appellant's live-in girlfriend. Texas died in the early morning hours of New Year's Day, January 1, 2011. Over the course of a ten-day trial, the State presented the testimony of thirty-two witnesses, including Rodriguez. The defense presented the testimony of nine witnesses, including appellant. We have summarized the testimony most pertinent to the issues before us.

### A. State's Evidence

#### 1. Lorraine Rodriguez[2]

Rodriguez testified that when Texas was born in March 2009, she was living with Texas's biological father, Raul Ruiz. The couple separated when Texas was seven months old. Rodriguez lived with her father for a while, then with her mother, Linda Rodriguez. In February 2010, she moved with Texas into an apartment. Several months later, in May 2010, she met appellant. A few weeks later, he moved into her

_____

child victim in this case was twenty-one months old.

[2] Pursuant to an agreement with the State, Rodriguez pleaded guilty to murder in exchange for a twenty-five-year sentence.

apartment.

Rodriguez worked at Walmart; appellant was not working. On June 24, 2010, at appellant's request, Rodriguez left Texas in appellant's care while she went to work. After going home for lunch, Rodriguez took Texas to the daycare facility where he was enrolled. A few hours later, the day care personnel called Rodriguez at work and asked her about some bruises and scratches on Texas. After Rodriguez picked Texas up from the daycare, she was interviewed by Child Protective Services (CPS). Appellant was present during the interview. Rodriguez had seen appellant spank Texas and slap him in the mouth on other occasions. However, she told the CPS investigator that Texas must have received the injuries from falling at her mother's house or from falling off the bleachers at a baseball park. Rodriguez testified that she gave these explanations to CPS to protect appellant. That same day, CPS ordered Texas's removal from Rodriguez and placed him with her mother. Texas was moved to a different daycare facility.

In late September, Rodriguez obtained CPS's approval to place Texas with her father. On one occasion, Rodriguez picked Texas up and took him to one of appellant's softball games. After the game, appellant spanked Texas numerous times, hit him in the mouth, and put him in "time-out." Appellant was also physically abusive to Rodriguez. If she attempted to stop appellant from hitting Texas, he would shove her or whip her with his belt. In early October, Rodriguez received a call from Texas's daycare facility regarding bruises on Texas.

On October 26, 2010, appellant called Rodriguez at work and told her to come home. When she arrived, she found Texas on the floor, stiff and unresponsive, with his

3

eyes rolled back. Appellant said Texas had slipped and fallen. On the advice of appellant's mother, Gloria Garza, Rodriguez did not take Texas to the emergency room. After about ten minutes, Texas regained consciousness. Rodriguez called Texas's pediatrician, who told her to take Texas to the emergency room. Rodriguez did not do so, however, because appellant was furious that she had consulted a doctor. Over the next week or so, Rodriguez noticed that Texas was unbalanced when walking, did not seem able to focus directly, and "seemed off."

On November 4, 2010, Rodriguez took Texas to the doctor. He was hospitalized for about a week. Rodriguez attributed the bruises on Texas to several falls. She did not tell the doctor about the October 26 incident because she was protecting appellant. When Texas was released from the hospital, she took him home, in defiance of the CPS safety plan, which prohibited her and appellant from having unsupervised contact with Texas.

A few days later, appellant became angry, spanked Texas, hit him in the mouth busting his lip, and put him in "time-out." In late November, Rodriguez was at WalMart when she received another call from appellant saying that Texas had fallen again and hit his head. When she returned home, Rodriguez found Texas unresponsive, much like he had been on October 26. He had scratches and bruises on his forehead. He was unresponsive for two hours. Appellant's mother said he probably had "another seizure," and applied ice packs to keep him awake. Appellant did not permit Rodriguez to celebrate Thanksgiving with her family because Texas had bruises. During December, Texas suffered frequent beatings by appellant.

On December 16, Texas had an appointment with his pediatrician. Rodriguez

4

explained Texas's bruises by saying that he had fallen on a slide at the park. Later, Rodriguez noticed that Texas cried inconsolably and flinched when appellant entered the room.

On New Year's Eve, Rodriguez planned to see her family while appellant was out at a club. Her plan did not materialize, however, because appellant learned Rodriguez had been talking to her mother by checking her cell phone. Instead of going out, appellant stayed home and invited his younger brothers, Isaac and Juan Dix, to play video games on the Nintendo Wii system. When Texas tried to join in, appellant became angry and punched him in the chest at least four or five times. Isaac and Juan asked appellant to stop, but he did not. Isaac and Juan left the apartment about 7:00 or 8:00 p.m. Appellant walked them to his mother's house and came right back.

Rodriguez, appellant, and Texas began watching a movie. Appellant got some cookies, but refused to give any to Texas, telling Texas that he was obese. Rodriguez brought some cookies to Texas. When the cookies were gone, Texas was whining for more. Appellant became furious, grabbed Texas by the arm, dragged him off the couch, and began beating him. Rodriguez had seen appellant beat Texas on prior occasions. Appellant punched Texas in the head, chest, face, and mouth, hitting him in the head with a closed fist at least seven times. Rodriguez told appellant to stop, but he only became more angry. Texas fell back, hit the wall, and fell to the floor. His body stiffened and began convulsing. Rodriguez picked him up, took him to his room, and sat on the floor holding him. He shook and seized for about twenty minutes; he was unresponsive. Then, Texas's body relaxed, and his eyes rolled back. He had vomit and blood coming out of his nose and mouth. Rodriguez sat holding Texas for an hour

5

and a half before she called 911. At some point, Texas stopped breathing. Rodriguez did not remember how long she waited after Texas stopped breathing before she called 911. When Rodriguez told appellant she was calling 911, he became angry, told her not to tell anyone that he was there, and left for his mother's house. When the emergency personnel arrived, Rodriguez said that Texas fell from the kitchen counter. She rode in the ambulance to the hospital, where Texas was pronounced dead. Appellant and his mother arrived at the hospital approximately fifteen minutes later. Rodriguez did not tell the truth about what happened because she was trying to protect appellant.

Rodriguez was interviewed at the police station. She did not tell the truth during the interview because appellant was in an adjacent room and texted her that he could hear her. After Texas's death, appellant became more loving and told Rodriguez he wanted to marry her. When Rodriguez was arrested in January,[3] appellant made her promise that she would "take the rap for him and he would go to college to do everything he could to get [her] out."

In June 2011, Rodriguez gave a truthful statement to the district attorney's office. She acknowledged that others may not believe her because she had lied for so long about the events that led to Texas's death.

On cross-examination, defense counsel questioned Rodriguez about a statement that she gave to Dr. Troy Martinez.[4] Counsel asked her about an incident when Texas was a baby and Raul Ruiz dragged Rodriguez around by her hair. Counsel asked if

---

[3] Based on Rodriguez's testimony, she was arrested in January for injury to a child based on the June 2010 incident. She made bond on that charge, and was arrested again on April 5.

[4] Troy Martinez, Ph.D., is a licensed psychologist who testified regarding a personality assessment that he completed of Rodriguez.

6

Rodriguez remembered telling Dr. Martinez that after Texas's death, her relationship with appellant was almost nonexistent; Rodriguez said she did not recall making the statement. Rodriguez admitted that she invited appellant to move in with her approximately two weeks after they met. Within a few weeks, Rodriguez knew appellant was physically abusing Texas. When Rodriguez was interviewed by CPS, she lied about Texas's injuries to protect appellant. Rodriguez disciplined Texas by putting him in "time-out," not by spanking him. Rodriguez testified that appellant's mother once threatened her "that if anything ever happened to her son or her family, whoever was at the other end trying to harm her family would regret it." Rodriguez admitted that she sent pictures of appellant and Texas to appellant in jail after Texas's death. In response to counsel's questions, Rodriguez said she did not recall telling her father in a phone conversation from jail that she never saw appellant do anything to Texas. Rodriguez said that in the phone call, her father told her that appellant's brothers, Juan and Isaac, had talked about what they had seen and that their story contradicted Rodriguez's claims that appellant had not harmed Texas. Rodriguez said that in the phone call, she was still trying to protect appellant. Rodriguez also admitted that in a conversation from jail, she told her mother that appellant never abused her.

Counsel questioned Rodriguez about the events on New Year's Eve. Rodriguez stated that appellant, Isaac, and Juan were playing Wii boxing. When Texas tried to join in the game, appellant yelled at him and punched him in the chest numerous times. Rodriguez said appellant still had the Wii controllers in his hands when he was punching Texas. Rodriguez said she did not "completely see the whole scene" because she left the room and went to the kitchen for a while. Rodriguez heard the boys yelling for

7

appellant to stop, and when she turned, appellant was "punching him already." Rodriguez said that Texas fell against the closet. Then, appellant put Texas in "time-out" facing the closet. Texas was sniffling in "time-out" while the boys continued playing games for another ten minutes or so. When appellant left to walk Isaac and Juan back home, Rodriguez got Texas and sat with him on the couch. Appellant was gone about ten minutes. During that time, Texas was lying on the couch. When appellant returned, Rodriguez said she only remembers sitting on the couch. Rodriguez admitted that while appellant was walking the boys home, she could have left the house and gone to her mother's house.

Rodriguez said that she brought cookies for Texas after appellant refused to give him cookies. Texas was whimpering for more cookies when appellant grabbed him and punched him in the head and mouth. Rodriguez admitted that she did not try to stop appellant. Appellant dragged Texas off the sofa and threw him up against the closet. When Texas fell against the closet, he started convulsing. Appellant started yelling for her to take Texas to another room. Texas vomited before she took him to the bedroom. Rodriguez sat on the floor with Texas in her lap for several hours. Eventually, she told appellant she was going to call 911. Appellant was not happy about that decision, but did not try to stop her from making the call. Rodriguez admitted that during the couple of hours before she called 911, she did not try to perform any first aid and just watched Texas die. The ambulance arrived after 2:00 a.m. Rodriguez said that she knew Texas was dead because he had stopped breathing. At the hospital, Rodriguez was in the room with Texas's body for a short while before appellant arrived. Before appellant arrived, Rodriguez had spoken to him by phone and had told him that Texas was dead.

8

After appellant arrived and came into the room with Texas's body, they both cried.

Rodriguez was interviewed by the police at the hospital. She told them Texas was on the kitchen counter reaching for cookies when he fell. Rodriguez told appellant and his mother that she told the same story to the EMS personnel. Rodriguez had also told the 911 operator and EMS personnel that appellant was not present at the apartment. Two police officers accompanied Rodriguez and appellant back to their apartment. At the apartment, the officers tried to separate Rodriguez from appellant, but because the apartment was small, he was able to see her wherever the officer took her. Rodriguez said that she and appellant had disposed of some of Texas's bloody clothing from prior beatings. After leaving the apartment, the police took them to the police station. They were placed in separate rooms. Rodriguez said appellant sent her text messages while she was in the interview room. When she left the room for a bathroom break, he texted that she should stop the interview and request a lawyer. Rodriguez did as appellant suggested, terminated the interview and requested a lawyer. A friend came and picked them up from the station.

Appellant was arrested in January on the injury-to-a-child charge stemming from the June 2010 incident. For a month or so, appellant was more attentive and loving. Later, however, he became physically abusive and hit her with his belt. As late as April, Rodriguez continued to claim that appellant was not present on New Year's Eve.

Rodriguez denied that she ever hit Texas on New Year's Eve. She also denied that she had told appellant that she was angry at being alone on New Year's Eve and that she pounded Texas's head on the floor to stop him from crying.

### 2. Isaac Dix

9

Isaac Dix was ten years old and in the fifth grade at the time of trial. Isaac testified about an essay that he wrote for a fourth-grade writing assignment.[5] The assignment was to write an essay about something that was lost and the lesson learned from the loss. Issac wrote about Texas's death.

Isaac testified that he learned of Texas's death when he woke up in the early morning and heard his mother and appellant crying. Isaac described how he and his brother Juan had played video games with appellant at the apartment the night that Texas died. Isaac said that Rodriguez and Texas were there while they played sports games on the Wii. Isaac stated that Texas was playing around with appellant and fell down when appellant "like kind of moved his elbow." Isaac testified that he thought Texas's fall was accidental. Isaac testified that the lesson he learned was, "[y]ou can't hit kids real hard in the chest or like on the arm or anything." Isaac stated that when appellant was punching Texas in the chest repeatedly, Rodriguez was in the kitchen. Neither Rodriguez nor Isaac did anything to stop appellant. Isaac said appellant punched Texas in the chest about ten times. Isaac did not try to stop appellant from punching Texas because he is "smaller" and was a little afraid of appellant. Isaac acknowledged that after he wrote the essay, his teacher made a phone call and Isaac was interviewed at school about Texas's death.

On cross-examination, defense counsel questioned Isaac about his essay. In response to counsel's questions, Isaac said some of the events recounted in the essay did not occur exactly as stated in the essay. For example, the essay states that the "whole family" went to the hospital the night Texas died; in fact, only appellant and his mother went to the hospital. The essay refers to Texas dying "by a heart attack," but

---

[5] The essay was introduced without objection as State's Exhibit 58.

Isaac testified that no one told him Texas died of a heart attack. Counsel also questioned Isaac about the passage in the essay stating, "The reason he [Texas] died was because my brother punched him in the chest over and over. What I learned from this was that you can't punch kids in the chest because they might die." Counsel asked, "Now, do you believe that's why he died, because he got punched?" Isaac responded, "Well, a little." Isaac testified that appellant punched Texas ten times and that Texas "fell hard" backwards to the floor. Texas got up and ran crying to Rodriguez. Isaac testified that when they left the house around 8:30, Texas did not look like he needed to go to the hospital.

### 3. Juan Jose Dix II

Juan testified that he is twelve years old and in seventh grade. Sometime after midnight on New Year's Eve 2010, he was about to go to sleep when appellant rang the doorbell. When appellant's mother let him in, he said he needed to go to the hospital to see Texas. Later that day, Juan learned that Texas had died.

Juan stated he saw Texas earlier that evening while playing Wii games at the apartment. Juan stated that Rodriguez was not at the apartment, but was with his mother. While they were playing, Texas came up to appellant crying. Appellant told Texas to go to "time-out." The following exchange occurred:

Q [Prosecutor]: . . . Do you remember telling [the interviewer] that when [Texas] would come up that [appellant] would punch him?

A [Juan]: He wouldn't like punch him. Well, my punching is like a bruise or a red mark. He didn't like punch punch.

Q: Okay. But you remember telling [the interviewer] that he punched and then told him to go to the corner?

A: Yes, ma'am.

11

Q:      Okay.  And so when you were talking to [the interviewer], you didn't say it was like a play punch, right?

A:      Well, I told him we played a lot.

Q:      Okay.  But you didn't—when you described it to [the interviewer] you just said punch?

A:      Yes, ma'am.

Q:      Okay.  You didn't qualify it at that time.  And you also talked about how—do you remember talking to [the interviewer] about maybe thinking about trying to get [appellant] to stop punching the baby?  Do you remember that, talking to him about that?

A:      No, ma'am.

Q:      Okay.  Did you used to go over there a lot or a little bit?

A:      Well, like kind of a little bit.

Q:      Okay.  And every time you went over there did you see Texas almost every time—

A:      No, ma'am.

Q.      —when you were over there?  And how many times did you see [appellant] punch Texas?

A.      Like one or twice.

Q:      Okay.  Had you ever had [appellant] punch you?

A.      Like when we'd play around.

Q:      Okay.  And do you remember talking about how [appellant] was acting after Texas died?

**A.**     He was crying a lot.

Q.      Do you remember talking about him being angry?

A.      Well, like I guess he was angry because of like how he was, but I'm not for sure.

12

Q:     Okay. And do you remember telling [the interviewer] that you couldn't do anything to stop [appellant] from hitting Texas because you would just get beat up? Do you remember telling [the interviewer] that?

A:     Yes, ma'am.

On cross-examination, Juan said that he and Isaac were dropped off at the apartment because his mother, sisters, and Rodriguez were going to the store. Texas got out of bed and would not stop crying. Appellant picked him up and put him in "time-out" in the corner. Counsel asked Juan to demonstrate for the jury how appellant punched Texas. Juan agreed that it "was not a very tough punch." Juan stated he never saw appellant hit Texas to hurt him. Counsel asked Juan to explain what he meant when he said in the videotaped interview that appellant would beat him up. Juan said he meant "[l]ike punching," but not in a way intended to hurt.

Juan said he saw appellant punch Texas with his fist once or twice. When the punching occurred, Rodriguez was not at the apartment.

On redirect examination, Juan testified that his mother told him not to talk about what happened to Texas.

**4. Kimberly Johnson**

Johnson testified that she dated appellant from ninth grade through her first year of college. She described appellant as "very controlling, possessive, obsessive, manipulative, verbally and physically abusive." She said that he would push her and throw things at her. On one occasion, he put his hands around her throat and threw her into a breakfast bar. He was also verbally abusive, calling her names. Even after their romantic relationship ended, Johnson and appellant talked to each other periodically,

13

but the relationship was volatile because appellant continued to be emotionally abusive. On some occasions, she talked with appellant on the phone when Rodriguez was in the apartment with him. Johnson said he spoke to Rodriguez "the same way he's always been with every girl, rude, disrespectful, bossy. He would talk to her like she was a dog."

In June of 2010, appellant left a voicemail message on Johnson's phone. Johnson returned the call, and appellant said he was seeking her advice on how to treat a bleeding lip injury that Texas sustained falling on a toy. Appellant called Johnson around 2:30 or 3:00 a.m. on New Year's Day 2011 "crying insanely" and told her that Texas had died and he was going to the hospital.

On cross-examination, Johnson testified that the last time she had an intimate relationship with appellant was April 2008. Johnson admitted that, even though appellant physically abused her on several occasions, she did not ever report his conduct to the police.

## B. Defense Evidence

### 1. Appellant

Appellant testified that he moved into Rodriguez's apartment in mid-June 2010. On June 24, 2010, appellant was asked to participate in an interview with CPS regarding alleged injuries to Texas. Appellant told the CPS investigators that he had seen Rodriguez spank Texas, but had not seen her abuse him. After CPS removed Texas and placed him with Linda, Rodriguez's mother, Rodriguez was initially upset, but after a few days, she was not very troubled by the situation. Appellant and Rodriguez were prohibited from visiting Texas without supervision. On one occasion, Linda called

Rodriguez and appellant because Texas would not stop crying. Appellant stated that after they arrived at Linda's house, Texas fell asleep in his arms. Texas lived with Linda through September 2010.

Rodriguez became unhappy with the arrangement because Texas began to refer to Linda as his mother. In late September or early October, Rodriguez obtained approval from CPS to place Texas with her father. This arrangement lasted only a couple of weeks, however, because Rodriguez's father asked her to pick Texas up. Although appellant knew that it violated CPS's order for Texas to live at the apartment, he did not report the violation. During this time, appellant lived part-time with Rodriguez and part-time at his mother's house. Appellant did not know whether Rodriguez was abusing Texas, but he did not witness any such abuse. Texas never did anything that caused appellant to want to hit him or hurt him. Appellant denied that he ever hid Texas from CPS or that he avoided being questioned by CPS. Appellant did not participate in the CPS-ordered parenting class because he felt he did not need the classes.

On October 26, Texas fell and hit the back of his head when he ran into the kitchen and slipped on water leaking from the refrigerator. Appellant said he was scared "to death" because Texas lost consciousness for ten seconds or so. Appellant called Rodriguez.

Appellant testified that in November, Texas fell and was hospitalized for about a week and "didn't look right from one side." On several occasions when appellant played softball, he made Texas stay in the stroller in the dugout because Rodriguez did not supervise him properly. Once, when appellant was playing, Texas fell off the bleachers and injured his lip.

15

Appellant stated that around Christmas, he took Texas to get a "mohawk" haircut. With Texas's hair cut short, appellant noticed several marks on his head. Appellant denied that he ever prevented Rodriguez from spending time with her family. Appellant said he played softball on several different teams four nights out of the week.

On New Year's Eve 2010, appellant was at his mother's house in the early evening. He invited his younger brothers to the apartment to play Wii. When they arrived, Texas was asleep in the bedroom, but he soon woke up. Texas slept on a mattress on the floor of his bedroom. When Texas came into the living room, he hugged appellant. Texas got the football that appellant had given him for Christmas and sat on the sofa. Appellant was playing Wii sports with his brother Juan. When Texas started dancing around in front of them, they put the game on "pause" and began "wrestling around." Appellant said they were "horseplaying." He denied punching Texas in the chest. When Texas started crying, appellant told him to sit on the sofa with Rodriguez.

Appellant said it was after 7:00 p.m. when he walked his brothers back to his mother's house. When appellant returned to the apartment, Rodriguez and Texas were watching a movie. After the movie ended, appellant left the apartment and went for a run around the neighborhood. After his run, appellant went back to his mother's house and did not return to the apartment that evening.

Appellant testified that while he was present on New Year's Eve, Texas did not throw up. Appellant received a text message from Rodriguez shortly before 1:00 a.m. on New Year's Day. When he did not receive a reply to his last text message, appellant called. Rodriguez answered and said she was in the ambulance. After 3:00 a.m.,

16

appellant received a call from Rodriguez telling him Texas had died. Appellant's mother drove him to the hospital. Appellant testified that, at that point, he had no reason to doubt Rodriguez's explanation that Texas had fallen from the kitchen counter. Appellant denied that he ever hurt Texas in a way that led to his death.

Several weeks after Texas's death, appellant was at the apartment when Rodriguez told him what happened after he left on New Year's Eve. Rodriguez told him she was frustrated because she wanted to go out and could not because of Texas. After appellant left, Texas kept crying, even after Rodriguez spanked him and put him in "time-out." When Texas continued to cry, Rodriguez slapped him, hit him, and finally, banged his head against the floor until he began to have seizures. Appellant did not report this information to anyone on the advice of his attorney.

On cross-examination, the prosecutor questioned appellant about why he was terminated by Walmart in the fall of 2009. Appellant responded that he was accused of stealing from Walmart. Appellant testified that he has a strained relationship with his stepfather, Juan Dix.

Appellant denied that he was babysitting Texas on the morning of June 24, 2010. Appellant testified that he left early that morning and was with his grandfather and uncle working on his grandfather's house. When he was interviewed by Rosemary Cruz of CPS on that day, appellant admitted that he was not being truthful when he told her he only stayed at Rodriguez's apartment about three nights a week. Appellant said he did not know that he was required to take the parenting classes as a condition of Rodriguez regaining custody of Texas.

Appellant testified that it was Rodriguez's idea to move Texas from her mother's

17

house to her father's house. However, the prosecutor impeached this testimony by showing appellant a letter he wrote to Rodriguez when they were both incarcerated; in the letter, appellant urged Rodriguez to move Texas to her father's house.

Appellant denied knowing anything about the bruises on Texas that were noticed by the daycare facility in early October. On October 26, appellant was babysitting when Texas slipped in the kitchen, hit the back of his head, and lost consciousness for about ten seconds. Appellant called Rodriguez at work; by the time she got home, Texas had regained consciousness. Appellant said he did not call 911 because Texas woke up. Texas was admitted to the hospital on November 4 and was not discharged until November 11. Appellant testified that he visited Texas in the hospital every day.

Appellant testified that in late October, Rodriguez "seemed to get mad a lot easier." Appellant saw Rodriguez spank Texas, but did not ever see her hit Texas in the mouth. On several occasions, however, he heard Texas and Rodriguez screaming and then saw Texas with a bleeding lip.

On New Year's Eve, appellant did not remember whether he was at the apartment earlier in the day. Appellant testified that he spent several nights a week at Rodriguez's apartment and several nights a week at his mother's house. He told Rodriguez that he planned to spend New Year's Eve at his mother's house. Appellant stated that when he and his brothers were playing video games, he was "horseplaying" with his brothers and Texas. The prosecutor asked appellant about a conversation he had with his mother after he learned what his younger brothers had said in their recorded statements. Appellant admitted that his mother said she was going to talk to Juan and Isaac to "make sure they were okay." The prosecutor asked, "[I]s Isaac Dix a

18

liar when he said on that video that you punched Texas so hard he fell back and he hit his head on the ground and started crying?" Appellant responded, "Yes." The prosecutor also asked if Juan was lying when he said in the video that he did not stop appellant because he was afraid appellant would beat him up. Appellant said, "Yes."

On New Year's Eve, after he walked his brothers home, appellant returned to the apartment and watched a movie. After the movie ended, appellant went for a run for less than an hour. Appellant then returned to his mother's house; his mother and brothers were watching television. Appellant stayed for a while and then went out for another run. He returned from the second run shortly after 2:00 a.m. After discovering that he was locked out of the house, he made several cell phone calls to his mother's phone. When she did not answer, he rang the doorbell. At some point, appellant exchanged several text messages with Rodriguez. When she did not respond to a text message, he called and learned that Rodriguez was in the ambulance. Appellant said that later, after 3:00 a.m., he stepped outside to use the phone. When he came back inside, he told his mother that Texas had died and asked her to take him to the hospital.

Appellant was questioned about a partial conversation with his mother that was recorded when appellant was interviewed at the police station. In the conversation, appellant appears to be discussing what he planned to tell the police about his whereabouts on New Year's Eve. Appellant testified that his mother encouraged him to lie about being at the apartment, but he told the truth because he did not have anything to hide. In late January, after appellant bonded Rodriguez out of jail, she told him that she had killed Texas by beating him. At the time, appellant did not believe her because he had never seen her beat Texas. Later, when the autopsy report reflected that Texas

19

died of blunt force trauma to the head and abdomen, he believed her. The prosecutor asked appellant why, after he was charged with Texas's murder, he did not tell anyone that Rodriguez had confessed to the killing. Appellant responded that his attorney had advised him not to say anything.

In response to the prosecutor's questions, appellant admitted that during his relationship with Rodriguez, he was seeing and talking to "a few" other women. Rodriguez wrote appellant numerous letters promising to protect him and never "turn" on him. On June 19, 2010, appellant was alone at the apartment with Texas because Rodriguez had gone to Walmart. While appellant was on the phone, he heard Texas fall; Texas's lip was bleeding and his toy xylophone had blood on it.

The prosecutor elicited testimony that Rodriguez was arrested for murder in April 2011 and was in jail for two months before she gave a statement implicating appellant to the District Attorney's office on June 7, 2011. The prosecutor asked appellant why Rodriguez would decide to frame him on June 7, 2011; appellant responded, "Probably because she was looking at life in prison, and if she pointed the finger at me she wouldn't get that much." The prosecutor noted that appellant's defense was that Rodriguez "framed" him; under that theory, however, Rodriguez could have framed him at any time—when she called 911 on New Year's Eve or at any time thereafter.

## II. EVIDENTIARY RULINGS

By his first, second, fourth, and fifth issues, appellant complains that the trial court erred in admitting certain evidence.

### A. Evidence Appellant Was Fired for Stealing

By his first issue, appellant complains that the trial court erred in admitting

evidence that he was fired from Walmart for stealing. Appellant argues that the evidence: (1) was irrelevant to any issues in the case; and (2) was inadmissible for impeachment purposes under Texas Rule of Evidence 608(b) because appellant had not been convicted of theft. The State argues that: (1) appellant failed to preserve any error; and (2) even if error was preserved, he cannot show harm.

### 1. Standard of Review

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2011). The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement. *Id.* If the trial court's decision is correct on any theory of law applicable to the case, we will uphold the decision. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009). "A timely and specific objection is required to preserve error for appeal." *Luna v. State,* 268 S.W.3d 594, 604 (Tex. Crim. App. 2008). "[A]ppellate arguments must correspond with the objection at trial." *See Butler v. State*, 872 S.W.2d 227, 236 (Tex. Crim. App. 1994).

### 2. Discussion

Before the State began its cross-examination of appellant, the following exchange occurred at a bench conference:

| [Prosecutor]: | . . . [Appellant] testified that he was working at Walmart and he was no longer working at Walmart. In the 404(b) I gave notice of my intent to introduce the fact that he was fired from Walmart for stealing, which is definitely going to the issue of credibility.[6] |

---

[6] The prosecutor referred to the State's "404(b)" notice of "Possible 'Extraneous' Offenses/Bad Acts Which May Be Offered at Trial," a three-page list of prior bad acts committed by appellant that the State filed prior to trial. Texas Rule of Evidence 404(b) provides:

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a

21

And I'd like to go into that.

Likewise, I gave notice to the Defense in my 404(b) that he was kicked out of his grandparents' house and moved in with Lorraine for stealing.

[Defense counsel]:    Those are not convictions.  They've not ever been adjudicated as to any guilt.  Those are not going to— we did not raise any issue that opened the door on that issue.

[The Court]:    Credibility.

[Defense counsel]:    But that's not—

[The Court]:    It will be allowed.

[Defense counsel]:    That's not—

[The Court]:    It will be allowed.

(Bench conference concludes.)

On cross-examination, the following exchange occurred:

Q [Prosecutor]:    Okay.  And when did you lose your job at Walmart?

A [Appellant]:    I honestly don't remember.

Q:    Okay.  Could it have possibly been in October of the previous year, in 2009?

A:    It could have been.

Q:    Late October?

A:    Late October or November, I believe.

---

person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon timely request by the accused in a criminal case, reasonable notice is given in advance of trial of intent to introduce in the State's case-in-chief such evidence other than that arising in the same transaction.

TEX. R. EVID. 404(b).

22

Q:      And why were you let go from Walmart?

A:      I had a theft charge.

Q:      A theft charge?

A:      Yes.

Q:      Who had you been accused of stealing from?

A:      From Walmart.

Q:      And that case ultimately caused you to be terminated. Is that correct?

A:      Yes, ma'am.

Appellant argues that counsel's objection "that 'we did not raised [sic] any issue that opened the door on that issue' calls into question the relevancy of the employee theft and his objection 'they've not ever been adjudicated as to any guilt' constitutes a challenge to the evidence under Rule 608(b), Texas Rules of Evidence."[7] The State argues appellant failed to preserve any error because counsel failed to clearly state the grounds for his objection and the grounds were not clear from the context.

Even assuming error, however, and that the issue was preserved, appellant cannot show that he was harmed. The admission of extraneous acts constitutes non-constitutional error that the reviewing court must disregard unless it affects a

---

[7] Texas Rule of Evidence 608(b) provides: "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be inquired into on cross-examination of the witness nor proved by extrinsic evidence." TEX. R. EVID. 608(b). Rule 609(a) provides:

> For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record but only if the crime was a felony or involved moral turpitude, regardless of punishment, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to a party.

*Id.* R. 609(a).

23

defendant's substantial rights. *See* TEX. R. APP. P. 44.2(b); *Lopez v. State*, 288 S.W.3d 148, 173 (Tex. App.—Corpus Christi 2009, pet. ref'd). Substantial rights are not affected by the erroneous admission of evidence if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *Lopez*, 288 S.W.3d at 173. In conducting our harm analysis, we consider everything in the record, including the nature of the evidence supporting the verdict, the character of the error and how it might be considered in connection with other evidence in the case, the State's theory and any defensive theories, and overwhelming evidence of guilt. *Yanez v. State*, 199 S.W.3d 293, 302 n.8 (Tex. App.—Corpus Christi 2006, pet. ref'd).

Here, assuming without deciding that the trial court erred in admitting evidence that appellant was fired by Walmart for alleged theft, we are confident that the evidence had little or no effect on the jury. Even if we assume that appellant's credibility was compromised by the theft allegation, ample other evidence existed—including the testimony of Rodriguez and Juan and Isaac—such that reasonable minds could convict appellant. The theft allegation was unrelated to the charged offense and was not mentioned again by the State. After considering the entire record, as we must, in evaluating harm, we cannot conclude that the complained-of error, if any, had a substantial and injurious effect or influence in determining the jury's verdict. TEX. R. APP. P. 44.2(b). We overrule appellant's first issue.

## B. Kimberly Johnson's Testimony

By his second issue, appellant complains that the trial court erred in admitting the testimony of Kimberly Johnson regarding her abusive relationship with appellant.

24

Appellant argues that Johnson's testimony "was not material on any material issue but only showed appellant's bad character and propensity toward abusive conduct with adult women." The State responds that Johnson's testimony was admissible for several "other purposes," including: (1) to rebut appellant's defensive theory that Rodriguez framed appellant; (2) to show appellant's motive to dominate Rodriguez; (3) to rebut appellant's defensive theory that Texas's death was accidental due to "horseplaying"; and (4) to rebut the defense's theory that it was not in appellant's character to be abusive.

### 1. Standard of Review and Applicable Law

As noted, we review a trial court's decision to admit or exclude evidence under an abuse of discretion standard, *see Martinez,* 327 S.W.3d at 736, and we uphold a trial court's ruling if it is correct on any theory of law applicable to the case, *see De La Paz*, 279 S.W.3d at 344.

"Rule 404(b) provides that evidence of other crimes, wrongs, or acts is not admissible 'to prove the character of a person in order to show action in conformity therewith'; however, it may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, or identity." *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009) (quoting TEX. R. EVID. 404(b)). "Rebuttal of a defensive theory is also one of the permissible purposes for which evidence may be admitted under Rule 404(b)." *Id.*; *see Moses v. State*, 105 S.W.3d 622, 626 (Tex. Crim. App. 2003); *see also Guerra v. State*, No. 13-11-297-CR, 2012 Tex. App. LEXIS 7358, at **11–12 (Tex. App.—Corpus Christi Aug. 30, 2012, no pet.) (mem. op., not designated for publication) (noting that otherwise inadmissible extraneous evidence is

25

admissible if a party "opens the door" to allow the opposing party to introduce extraneous evidence or the extraneous evidence is relevant to rebut an asserted defensive theory).

## 2. Discussion

At a bench conference prior to Johnson's testimony, the prosecutor argued that Johnson's testimony regarding her relationship with appellant was admissible because: (1) it "speaks to the [defense's] cross examination of [Juan and Isaac Dix] as to whether or not [appellant] is a violent person and whether or not he is an aggressive person"; and (2) it refutes evidence presented by the defense that Rodriguez had earlier denied that appellant was abusive to her. The prosecutor further argued that appellant's "propensity to violence" was particularly relevant where the defense's "cross examination of several of the State's witnesses ha[d] possibly left a false impression with the jury that [appellant] . . . is not a violent person." The trial court permitted Johnson's testimony.

We agree with the State that the trial court did not abuse its discretion in permitting Johnson's testimony. In his opening statement, defense counsel told the jury that the evidence would show that Rodriguez was alone on New Year's Eve when she beat Texas until he had a seizure and that appellant was not present. Counsel told the jurors that Rodriguez's motive in claiming that appellant beat Texas to death was "to save herself from prison time." Appellant's defensive theory throughout the trial was that Rodriguez alone killed Texas and later decided to claim that appellant was responsible for Texas's death in order to receive more favorable treatment by the State. During defense counsel's cross-examination of Juan, counsel asked Juan about how

26

appellant handled Texas when he picked him up and put him in the corner on New Year's Eve. Counsel asked whether appellant was "harsh" or "angry" or picked Texas up "roughly." Juan responded, "No, sir." Counsel asked whether Juan had ever seen appellant "actually mistreat Texas." Juan answered, "No, sir." Counsel invited Juan to demonstrate for the jury how appellant punched Texas; Juan agreed that it "was not a very tough punch." Counsel asked Juan if he had ever seen appellant "haul back and hit Texas to hurt Texas." Juan replied, "No, sir." Counsel asked if appellant enjoyed being around Texas; Juan said, "Yes, sir." Counsel asked Juan about his video testimony that appellant beat him up. Counsel asked whether appellant punched Juan "in a mean, malicious way, like he's trying to hurt you." Juan answered, "No, just like so we can get out of the way." Clearly, this testimony was elicited to support the defensive theory that appellant was not an abusive person. Johnson's testimony that appellant physically abused her—by pushing her, throwing things at her, and on one occasion, putting his hand on her throat and throwing her into a breakfast bar—rebutted appellant's defensive theory that he was not an abusive person. *See Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008) (finding trial court did not abuse its discretion in admitting extraneous-offense evidence for non-character-conformity purpose of rebutting appellant's defensive theory). We overrule appellant's second issue.

### C. Juan and Isaac Dix's Video Statements

By his fourth and fifth issues, appellant contends the trial court erred in admitting the video statements of Juan and Isaac Dix, respectively.

### i. Juan Dix

Appellant argues on appeal that the trial court erred in admitting Juan's video

statement under Texas Rule of Evidence 613(a) because under the rule, "a prior statement must be inconsistent with the one given at trial" and "[n]either Juan Dix nor Isaac Dix ever made an unequivocal admission that he had given a prior inconsistent statement." *See* TEX. R. EVID. 613(a) (providing that extrinsic evidence of a witness's prior inconsistent statement is inadmissible if the witness unequivocally admits to making the prior inconsistent statement).

The State argues that appellant failed to preserve any issue for review because his complaint on appeal does not comport with the complaint made at trial. *See Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002) (stating that "the point of error on appeal must comport with the objection made at trial"). The State argues that, at trial, appellant objected to the admission of Juan's recorded statement on grounds that Juan had not made an unequivocal *denial* of his prior recorded statements, whereas appellant complained on appeal that Juan had not made an unequivocal *admission* that he had given a prior inconsistent statement.[8]

Assuming, without deciding, that appellant preserved the issue for review, we find appellant's argument that Juan was not confronted with inconsistent statements from his video interview to be without merit.

---

[8] At trial, appellant's counsel objected to the admission of Juan's recorded statement as follows:

> [Counsel]: Your Honor, with respect to [Juan Dix's] testimony, there has been no acknowledgment of a prior inconsistent statement. Every time he was advised of a potentially inconsistent statement[,] he admitted to making the statements and admitted to what it was. 613 of Texas Rules of Evidence requires an unequivocal—basically an unequivocal denial of having made the statement before. And as such, these statements are not admissible as a prior inconsistent statement.

In response, the State argued that Juan's testimony at trial was inconsistent with his recorded statement regarding (1) how appellant punched Texas, (2) where Rodriguez was, (3) what Juan was instructed to say to others regarding the events on New Year's Eve, and (4) what appellant said when he entered his mother's house on New Year's Eve.

28

### a. Standard of Review and Applicable Law

We uphold a trial court's evidentiary ruling if it is correct on any theory of law that finds support in the record. *Gonzalez v. State*, 195 S.W.3d 114, 126 (Tex. Crim. App. 2006). The rule of admissibility of prior inconsistent statements should be liberally construed and the trial judge has the discretion to receive any evidence that gives promise of exposing a falsehood. *Staley v. State*, 888 S.W.2d 45, 49 (Tex. App.—Tyler 1994, no pet.).

A prior inconsistent statement is a statement made by a witness before trial that contradicts testimony by the witness at trial. *See Madry v. State*, 200 S.W.3d 766, 769 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd) (citing *Lopez v. State*, 86 S.W.3d 228, 230 (Tex. Crim. App. 2002) (en banc)). A party may impeach a witness with evidence of a prior inconsistent statement if the party first presents the witness with the existence of the statement, the details and circumstances surrounding the statement, and gives the witness the opportunity to explain or deny the statement. TEX. R. EVID. 613(a); *Madry*, 200 S.W.3d at 769. If a party fails to establish this predicate, the trial court should sustain an objection to extrinsic proof of the prior inconsistent statement. *Madry*, 200 S.W.3d at 769. Extrinsic evidence of the prior statement may not be offered if the witness unequivocally admits making the prior inconsistent statement. TEX. R. EVID. 613(a); *McGary v. State*, 750 S.W.2d 782, 787 (Tex. Crim. App. 1988). However, if the admission is partial, qualified, or otherwise equivocal, or if the witness claims to not remember making the prior statement, the prior statement is admissible for impeachment purposes. *Abdygapparova v. State*, 243 S.W.3d 191, 204 (Tex. App.—San Antonio 2007, pet. ref'd).

29

### b. Discussion

In his video statement, Juan stated that appellant gets angry frequently and yells, cusses, and punches people, including himself, Isaac, and Texas. On New Year's Eve, Juan, Isaac, and appellant were playing video games at the apartment. Texas was bothering them, and appellant punched him; when Texas cried, appellant made him stand in the corner. Juan said he could not do anything to help Texas because appellant would beat him up. He learned Texas had died later that night when appellant came home and said Texas was dead.

At trial, Juan testified, in pertinent part:

Q [Prosecutor]:  Okay. And so then what happened after he [Texas] just kept crying and crying and crying?

A:  My older brother told him to go to time-out.

Q:  Okay. And is that all that happened?

A:  Yes, ma'am.

Q:  Do you remember you told [the interviewer] some different stuff than that?

A:  Kind of.

. . . .

Also, as detailed above, Juan qualified his video statement that appellant punched Texas by saying that appellant "didn't like punch[,] punch [Texas]." He also testified that he did not recall talking to the interviewer about trying to get appellant to stop punching Texas. He later testified that he did recall telling the interviewer that he could not do anything to stop appellant because appellant would have beaten him.

We conclude that Juan's admissions at trial regarding his prior statements were

30

partial and qualified, and the trial court therefore did not abuse its discretion in admitting his recorded statement. *See Abdygapparova*, 243 S.W.3d at 204. We overrule appellant's fourth issue.

**ii.     Isaac Dix**

By his fifth issue, appellant contends that the trial court erred in admitting the video statement of Isaac Dix. Appellant again argues that the recorded statement was not admissible because Isaac did not unequivocally admit that he had given a prior inconsistent statement.

As with Juan's statement, assuming without deciding that appellant preserved the issue for review, we address the merits of appellant's argument.

**a.   Standard of Review and Applicable Law**

Because we have already stated the applicable law, we proceed to a discussion of Isaac's statement and testimony.

**b.   Discussion**

In his recorded statement, Isaac stated that he, Juan, and appellant were playing video games at the apartment. Appellant became angry at Texas because he kept interrupting the game. Isaac said appellant punched Texas real hard in the chest, near his heart, about ten times. Texas was knocked to the floor and hit his head. Isaac said he and Juan asked appellant to stop, but he did not. Appellant also made Texas stand in the corner. Later that evening, Isaac was asleep back at his mother's home when he heard appellant come to his mother's house crying that Texas was dead. Appellant told his mother that he was sorry that he had kept punching Texas and "stuff" came out of Texas's mouth.

At trial, Isaac testified as follows:

Q [Prosecutor]: Okay. [Texas is] playing around with [appellant]. And what's happening while they're playing around?

A: Like [appellant] kind of like moved his arm and then Texas fell and everything. And then [Rodriguez] picked him up and put him on his bed.

Q: Okay. And was that all that happened?

A: Yes. Then Texas fell asleep. And before me and Juan Jose fell asleep, [appellant] walked us back home.

Q: Okay. So when you guys were playing games, Texas fell down one time?

A: Yes.

Q: And why did he fall down?

A: Because [appellant] like kind of moved his elbow.

Q: Okay. And did you think that was an accident or—

A: An accident.

. . . .

Q: Okay. When [appellant] was punching Texas in the chest, where on the chest would he punch him? Do you want to show me?

A: Right here.

Q: Right up here somewhere, in here?

A: Right here.

Q: Right here?

A: Yeah.

Q: Okay. Kind of like where your heart is?

A: (Nodded.)

32

Q:      Okay.  And did that happen lots of times or just a few times?

A:      Just like a few.

Q:      Okay.  Do you remember when you told [the interviewer] how many times?

A:      Yes.

Q:      How many times did you tell him?

A:      I said like ten.

As with Juan's admissions, we conclude that Isaac's admissions at trial regarding his prior statements were partial and qualified, and the trial court therefore did not abuse its discretion in admitting his recorded statement.  *See id.*  We overrule appellant's fifth issue.

### III. SUFFICIENCY OF NON-ACCOMPLICE EVIDENCE

By his third issue, appellant contends that the non-accomplice evidence is insufficient to support his conviction.  He asserts that the injuries that caused Texas's death were sustained sometime between 11:30 p.m. and 3:00 a.m., and that only Rodriguez's testimony places him with Texas at that time.

### A. Standard of Review and Applicable Law

The Texas Court of Criminal Appeals recently laid out the standard of review for sufficiency of non-accomplice evidence as follows:

[U]nder Texas Code of Criminal Procedure Article 38.14, a conviction cannot stand on an accomplice witness's testimony unless the testimony is corroborated by other, non-accomplice evidence that tends to connect the accused to the offense.  Evidence that the offense was committed is insufficient to corroborate an accomplice witness's testimony.  And an accomplice's testimony cannot be corroborated by prior statements made by the accomplice witness to a third person.

33

* * * *

> When reviewing the sufficiency of non-accomplice evidence under Article 38.14, we decide whether the inculpatory evidence tends to connect the accused to the commission of the offense. The sufficiency of non-accomplice evidence is judged according to the particular facts and circumstances of each case. The direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense. So when there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—we will defer to the fact[-]finder's resolution of the evidence. Therefore, it is not appropriate for appellate courts to independently construe the non-accomplice evidence.

*Smith v. State*, 332 S.W.3d 425, 439, 442 (Tex. Crim. App. 2011) (internal citations omitted); *see* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005).

Proof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction. *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984). Evidence that the defendant was in the company of the accomplice near the time or place of the offense is also proper corroborating evidence. *McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997). If the combined weight of the non-accomplice evidence tends to connect the defendant to the offense, then the requirement of article 38.14 has been fulfilled. *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999).

**B. Discussion**

Appellant's entire argument consists of four sentences:

> The medical examiner testified that the injuries that caused the death of Texas Ruiz occurred sometime in the time frame of 11:30 p.m. and 3:00 a.m. Defendant testified and denied that he was with Texas Ruiz during that time frame. The only witness that can place Defendant at the same

34

place as Texas Ruiz during that time frame is Lorraine Rodriguez. If you take Lorraine Rodriguez's testimony out of the case, there is no evidence that Defendant was at the place where the fatal injuries were inflicted.

We disagree. In his video statement and in his trial testimony, Juan testified that appellant punched Texas on New Year's Eve. He also stated in his video statement that he learned of Texas's death when appellant came to his mother's house that night and said Texas was dead.

In his video statement, Isaac stated that appellant punched Texas in the chest, near his heart, about ten times. He also stated that on New Year's Eve, he woke up when he heard appellant come to his mother's house crying that Texas was dead. Isaac heard appellant tell his mother that he was sorry for punching Texas and that "stuff" came out of Texas's mouth. In addition, the jury considered Isaac's essay, in which he stated that, "[t]he reason [Texas] died was because my brother punched him in the chest over and over."

Juan and Isaac's video statements, in which they describe appellant coming to his mother's house on New Year's Eve stating that Texas had died, are consistent with Rodriguez's testimony that appellant left the apartment after inflicting fatal wounds to Texas and went to his mother's house in the early morning hours of New Year's Day. Juan and Isaac's testimony that appellant punched Texas in the chest repeatedly on New Year's Eve corroborates Rodriguez's testimony that appellant was responsible for the injuries Texas suffered on New Year's Eve. Moreover, "[t]he jury is the exclusive judge of the credibility of witnesses and of the weight to be given testimony, and it is also the exclusive province of the jury to reconcile conflicts in the evidence." *Westbrook v. State,* 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). We conclude that the

35

combined weight of the non-accomplice evidence tends to connect appellant to the offense. *See Cathey*, 992 S.W.2d at 462. We overrule appellant's third issue.

## IV. CONCLUSION

We affirm the trial court's judgment.

_____
DORI CONTRERAS GARZA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b)

Delivered and filed the
13th day of December, 2012.